2014 UT App 58

**STATE of Utah, Plaintiff and Appellee,**

v.

**Milan OTKOVIC, Defendant and Appellant.**

No. 20120197–CA.

Court of Appeals of Utah.

March 13, 2014.

State had overcharged him.

---

4. At trial, Mr. Manatau did not dispute the essential facts of the case. He only argued that the

Elizabeth Hunt, for Appellant.

Sean D. Reyes and Christopher D. Ballard, for Appellee.

Judge JAMES Z. DAVIS authored this Opinion, in which Judge GREGORY K. ORME concurred. Judge J. FREDERIC VOROS JR. concurred, with opinion.

DAVIS, Judge:

¶ 1 Milan Otkovic challenges his convictions and sentences for aggravated kidnapping, a first degree felony, Utah Code Ann. § 76–5–302(1), (3) (LexisNexis Supp.2013),[1] and aggravated robbery, a first degree felony, *id.* § 76–6–302(1)–(2) (2012). We reverse and remand for a new trial.

## BACKGROUND

¶ 2 On May 24, 2009, Otkovic sent a text message to Travis Hawkins offering to sell

---

1. Because the provisions of the Utah Code under which Otkovic was convicted have not substantively changed, we cite the current version for the reader's convenience.

him a television and a computer.[2] According to Otkovic, he and another man named Matt Shields were involved in a multi-state theft ring with Hawkins. Otkovic, Shields, and others would create receipts for high-priced items they had not purchased and use the receipts to walk out of the store with stolen merchandise. They would then sell the merchandise to Hawkins, who would resell it for a profit. Otkovic maintains that he and Shields met Hawkins at Hawkins's brother's window tinting shop and sold the television and computer to him for approximately $1,600 and that Hawkins voluntarily drove to an ATM to obtain cash to pay them.[3]

¶ 3 Hawkins reported and later testified that he believed the text message came from Shields and that he had never met Otkovic but had seen him once before in Shields's company. According to Hawkins, it was not Otkovic and Shields, but Otkovic and an unidentified woman, who met him at the tinting shop. He maintained that Otkovic had not brought anything to sell but instead held Hawkins at gunpoint and demanded money. After stealing $1,680 in cash from Hawkins's wallet, Otkovic ordered Hawkins to drive them to an ATM to get more money. Hawkins drove them to an ATM about six blocks away and withdrew $300 from one account but avoided withdrawing more money from other accounts by pretending to have forgotten his PIN numbers. Eventually, Otkovic relented and had Hawkins return them to the tinting shop, whereupon he stole Hawkins's phone, threatened him, and ordered him not to report the robbery. Otkovic then forced Hawkins to stand in front of an upstairs window holding up a broom while Otkovic made his escape, threatening to come back to "take care of" Hawkins if he saw the broom drop.

¶ 4 Hawkins's girlfriend claimed that he arrived home "frantic" and "shaking" and announced that he had been robbed. Hawkins reported that he used his son's phone to call Shields and get Otkovic's name and phone number. He then called Otkovic and told him that he would not involve the police if Otkovic would return his money and phone. Hawkins and his girlfriend asserted that Otkovic then threatened to kill Hawkins's children.

¶ 5 After talking to Otkovic, Hawkins contacted police to report the robbery. A short time later, Hawkins provided the police with a cell phone that he claimed to have received from Shields. The cell phone contained text messages received from Otkovic's phone. The first was sent at 7:57 p.m., about two minutes before the ATM withdrawal occurred. It read, "I'm Robbin[g] Travis. Don't tell him my name or anything, not my phone number, not a work, [sic] I'm serious." Additional messages were received later in the evening: an 8:11 p.m. text read, "Don't snitch on me niga"; an 8:12 p.m. text read, "I told him I was fightin with you ha ha ha don't listen to him I told him I robbed you too. But don't bring my number or name up"; a 9:16 p.m. text read, "U gave that niga my number?"; and a 9:51 p.m. text read, "Ha ha ha ya I told him ima rob you too. I'm playin tho. I mean u still owe me 1500 don't forget." Hawkins reported that he had seen Otkovic using a white Blackberry cell phone at various points during the robbery but that he had not noticed Otkovic using it while they were at the ATM.

¶ 6 When Otkovic was arrested, police searched his home and found a white Blackberry and a pistol that matched Hawkins's description of the gun Otkovic had used. They also found $1,616 in cash. The phone number associated with the Blackberry was the same phone number used to send the text messages discovered on the phone Hawkins had delivered to police. At trial, Otkovic testified that he had loaned his phone to Shields a "few times" while they were meeting with Hawkins and then later that night before they separated around 10:00 p.m. When the State began questioning a police

---

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Bluff*, 2002 UT 66, ¶ 2, 52 P.3d 1210 (citation and internal quotation marks omitted).

3. When initially arrested, Otkovic claimed not to have been with Hawkins at all on the night of the robbery, but he later admitted to having met Hawkins for the purpose of selling him stolen property.

witness about the text messages, Otkovic objected, arguing that the State had failed to lay a sufficient foundation for the text messages to be admitted. The trial court overruled the objection and admitted the texts.

¶ 7 In the course of their investigation, the police requested that U.S. Bank provide copies of surveillance video from the ATM. A representative from the bank sent an email describing the footage: "Here is what I have: Now you can see that there is someone else in the car but there is no way to tell who it is since the camera is (theoretically) aimed at the driver. The driver also puts his hands up periodically." Three photographs were attached to the email, but no passenger was visible in the photographs and none of them portrayed Hawkins holding up his hands. The State did not disclose the photographs or the email to Otkovic until the week before trial. Upon receiving this information, Otkovic's counsel attempted to obtain the surveillance video from the bank but was informed that only the photographs had been retained and that the video had been destroyed. Based on the email describing footage not contained in the photographs and the bank's representation that the video was destroyed, Otkovic moved to dismiss the case due to loss or destruction of evidence. The trial court denied the motion because it concluded that Otkovic could not demonstrate a reasonable probability that the video footage, if it existed, contained exculpatory evidence. However, the trial court did fault the State for failing to timely disclose the photographs and prohibited the State from using the photographs at trial.

¶ 8 Prior to trial, Otkovic also moved to admit evidence relating to Hawkins's criminal enterprise both to impeach Hawkins's credibility and to support the defense theory that the money Hawkins claims Otkovic stole from him was actually given to Otkovic by Hawkins as payment for stolen goods. Otkovic also asserted that the evidence would demonstrate that Hawkins was familiar with Otkovic's gun before the alleged robbery and that he had a motive to frame Otkovic out of loyalty to Shields, who was becoming paranoid because Otkovic was outperforming him. The court permitted Otkovic to introduce evidence of his dealings with Hawkins and Shields and of the rivalry between Otkovic and Shields, but it excluded other general evidence of Hawkins's criminal activity under rule 403 of the Utah Rules of Evidence because of its potential to mislead the jury and delay the trial. Shields was unavailable to testify at trial, so evidence relating to Hawkins's criminal involvement with Shields and Otkovic was limited to Otkovic's own testimony.

¶ 9 When Hawkins was asked about his business at trial, he admitted to buying and reselling things but maintained that he was unaware whether the merchandise was stolen and that in ten years he had never had a problem with merchandise he had purchased and resold turning out to be stolen. In response to this testimony, Otkovic sought to introduce evidence that during the previous ten years, Hawkins had been convicted of burglary, charged with stealing golf carts, and arrested several times for receiving stolen property, as well as evidence gathered by investigators indicating that Hawkins had continued to act as a fence[4] after the incident with Otkovic. However, the trial court reaffirmed its earlier ruling and prevented Otkovic from presenting any of this evidence. During closing argument, the prosecutor relied on Hawkins's representation that he had never had any problems with stolen property, reminding the jury, "Mr. Hawkins testified, 'I have had no problems with stolen goods.' ... [D]id you ever hear any ... evidence introduced that Mr. Hawkins lied about that? Any evidence introduced that Mr. Hawkins has had any problems? No. Because he hasn't."

¶ 10 The jury convicted Otkovic of aggravated kidnapping and aggravated robbery. He had also previously pleaded guilty to possession of a weapon by a restricted person. The trial court sentenced him to prison terms of six years to life for aggravated robbery, sixteen years to life for aggravated kidnapping, and zero to five years for possession of a weapon. At the time, Otkovic was

---

4. A "fence" is "a person who receives and disposes of stolen goods." Dictionary.com, http:// dictionary.reference.com/browse/fence (last visited Feb. 19, 2014).

already serving sentences for previous convictions. The trial court ordered that his sentences for his convictions in this case run concurrently with each other but consecutive to the sentences he was already serving. Otkovic appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 11 First, Otkovic challenges the trial court's decision to exclude relevant evidence regarding Hawkins's history as a fence under rule 403 of the Utah Rules of Evidence [5] "We review a trial court's decision to admit or exclude evidence under Rule 403 of the Utah Rules of Evidence under an abuse of discretion standard, and will not overturn a lower court's determination of admissibility unless it is beyond the limits of reasonability." *Diversified Holdings, LC v. Turner*, 2002 UT 129, ¶ 6, 63 P.3d 686 (citation and internal quotation marks omitted).

¶ 12 Otkovic further asserts that the trial court erred in finding the foundational evidence sufficient to authenticate the text messages. We review the trial court's determination for abuse of discretion. *See State v. Silva*, 2000 UT App 292, ¶ 11, 13 P.3d 604.

■ ¶ 13 Finally, Otkovic argues that his case should have been dismissed due to the loss or destruction of the ATM video. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness," but "we incorporate a clearly erroneous standard [in reviewing] the necessary subsidiary factual determinations." *State v. Tiedemann*, 2007 UT 49, ¶ 12, 162 P.3d 1106 (citation and internal quotation marks omitted).[6]

## ANALYSIS

### I. Exclusion of Evidence Under Rule 403

■ ¶ 14 Otkovic asserts that evidence of Hawkins's criminal history as a fence is rele-

vant to contradict Hawkins's claim at trial that he had "never had a problem with anything [he's] purchased" turning out to be stolen and to support Otkovic's theory that his criminal involvement with Hawkins and Shields gave them a motive to frame him. The State asserts that the trial court acted within its discretion in excluding the evidence under rule 403 of the Utah Rules of Evidence out of concern that general evidence relating to Hawkins's fencing operation would "confuse the jury and unduly delay the trial."

¶ 15 Under rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. "Rule 403 ... is an inclusionary rule. Specifically, Rule 403 presumes the admission of all relevant evidence except where the evidence has an unusual propensity to unfairly prejudice, inflame, or mislead the jury.... [I]f the evidence is prejudicial but is at least equally probative[,] ... it is properly admissible." *State v. Ramirez*, 924 P.2d 366, 369–70 (Utah Ct.App.1996) (second alteration and second omission in original) (citations and internal quotation marks omitted); *see also State v. Dunn*, 850 P.2d 1201, 1221–22 (Utah 1993) (explaining that "we indulge a presumption in favor of admissibility").

¶ 16 Throughout the proceedings, the trial court expressed concern about "throwing the door wide open" to Otkovic's "general effort to show that [Hawkins] is a fence and a bad guy." In its pretrial ruling, the trial court expressed particular concern with evidence regarding "the vastness of Mr. Hawkins' operation and the money that he was raking in" as being "absolutely irrelevant." Given the trial court's broad discretion to evaluate the admissibility of evidence under rule 403, we do not consider the trial court's decision to limit general evidence regarding Hawkins's

---

5. Although Otkovic also asserts the admissibility of this evidence under rules 404(a), 404(b), 405(b), and 608(c) of the Utah Rules of Evidence, the trial court's ruling was based solely on rule 403, and the State has not raised an alternative argument that the evidence should have been excluded under any other rule of evidence.

6. Otkovic raises a number of additional claims on appeal that we need not address in light of our ruling on the rule 403 issue.

fencing operation to have been outside its discretion.

¶ 17 However, we agree with Otkovic that the extent of that limitation was unreasonable. The question of whether Hawkins was a fence was not raised simply to show that Hawkins was a criminal; rather, it was central to Otkovic's defense that he had been part of Hawkins's criminal enterprise and that his involvement in that enterprise had given Hawkins and Shields a motive to frame him. *See* Utah R. Evid. 404(b)(2) (providing that evidence of prior bad acts "may be admissible for [noncharacter] purpose[s], such as proving motive"); *id.* R. 608(c) (providing that a "motive to misrepresent may be shown to impeach the witness either by examination of the witness or by other evidence"). Evidence demonstrating the basic fact that Hawkins was a fence was at least equally probative as it was prejudicial, especially after Hawkins asserted that he had "never had a problem" with stolen property. *Cf. State v. Thompson*, 2014 UT App 14, ¶ 30, 318 P.3d 1221 ("[O]nce the defendant offers evidence or makes an assertion as to any fact, the State may cross-examine or introduce on rebuttal any testimony or evidence which would tend to contradict, explain or cast doubt upon the credibility of his testimony." (emphasis, citation, and internal quotation marks omitted)). While it may not have been necessary to introduce evidence demonstrating the size of Hawkins's operation and the money he made, proving that Hawkins was knowingly involved in a fencing operation was necessary to Otkovic's defense. Because Shields was not available to testify, Otkovic was prevented from presenting any other evidence to corroborate his own testimony that Hawkins fenced goods stolen by Otkovic and Shields.

¶ 18 In particular, the probative value of evidence contradicting Hawkins's assertion that he had "never had a problem" with stolen property far outweighed any danger of confusing the jury or delaying the trial. If Otkovic were seeking to disprove the truthfulness of a statement relating to a collateral matter, we might be inclined to defer to the trial court's ruling under rule 403. But given that the statement concerned a fact at the heart of Otkovic's defense—whether Hawkins was a fence who had purchased stolen property from Otkovic—Otkovic's inability to contradict it significantly undercut his defense. In fact, preventing Otkovic from presenting any general evidence that Hawkins was a fence was likely to result in the very outcome the trial court was trying to avoid—confusing the jury. In closing argument, the State used this lack of evidence to bolster Hawkins's testimony and make it appear as though there was no evidence available to contradict Hawkins's assertion that he had never had a problem with stolen property: "Mr. Hawkins testified, 'I have had no problems with stolen goods.' . . . [D]id you ever hear any . . . evidence introduced that Mr. Hawkins lied about that? Any evidence introduced that Mr. Hawkins has had any problems? No. Because he hasn't."

¶ 19 The State asserts that even if the trial court erred in excluding evidence under rule 403, the error was harmless in light of damning evidence against Otkovic, namely the text messages in which Otkovic admits to robbing Hawkins and the fact that he lied to police by claiming not to have been with Hawkins on the night of the alleged robbery. However, neither piece of evidence is determinative. Although sufficient foundation was laid for the texts to be admissible, *see infra* ¶ 21, the evidence of their authenticity was not conclusive. Otkovic testified that Shields was present when he met Hawkins and that he loaned his phone to Shields during the time when the text messages were sent, and Hawkins testified that he did not see Otkovic using the phone while they were at the ATM. Furthermore, the number to which the texts were sent did not match either of the numbers stored in Otkovic's phone as belonging to Shields or the number Otkovic used to call Shields after the robbery. And the texts warned Shields not to give Hawkins Otkovic's phone number, despite the fact—demonstrated by phone records—that Hawkins already had Otkovic's phone number. Given Otkovic's defense that he had been framed, this evidence could have raised a reasonable doubt as to who actually sent the messages from Otkovic's phone. Additionally, evidence that Otkovic lied to police about being with Hawkins does not necessarily prove that he

robbed Hawkins; it could also be explained by Otkovic's desire to keep police from finding out about his selling stolen property. Had the jury been presented with evidence supporting Otkovic's assertion that Hawkins was a fence, it may have been more inclined to believe Otkovic's story, including his assertions about the text messages. Thus, the blanket exclusion of this evidence undermines our confidence in the verdict.[7] *See State v. Knight,* 734 P.2d 913, 920 (Utah 1987) ("For an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict."). We therefore find it necessary to reverse Otkovic's conviction and remand for a new trial.

## II. Other Issues Likely to Arise on Remand

¶ 20 Because Otkovic will receive a new trial, we need not address the majority of his remaining arguments.[8] However, we find it necessary to address two legal issues that are likely to arise on remand and were fully briefed on appeal, namely, the admissibility of the text messages and the impact of the missing ATM video. *See State v. James,* 819 P.2d 781, 795 (Utah 1991) ("Issues that are fully briefed on appeal and are likely to be presented on remand should be addressed by this court.").

### A. Admissibility of the Text Messages

¶ 21 Otkovic argues that the trial court should not have admitted the text messages between his phone and the phone allegedly provided by Shields because the messages were not properly authenticated. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Utah R. Evid. 901(a); *see also id.* R. 901(b) (providing examples of how evidence may be authenticated).

¶ 22 We have not previously had the opportunity to consider the foundational requirements that must be met in order for text messages to be admitted. However, a number of other jurisdictions have held that text messages may be "authenticated by circumstantial evidence establishing the evidence was what the proponent claimed it to be." *State v. Thompson,* 2010 ND 10, ¶ 24, 777 N.W.2d 617 (collecting cases); *see also Commonwealth v. Koch,* 39 A.3d 996, 1005 (Pa.Super.Ct.2011) (holding that "authentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person," and that "[c]ircumstantial evidence, which tends to corroborate the identity of the sender, is required" as a foundational prerequisite to admissibility), *appeal granted,* 615 Pa. 612, 44 A.3d 1147 (2012) (No. 947 MAL 2011); *cf. State v. C.D.L.,* 2011 UT App 55, ¶ 25, 250 P.3d 69 (explaining that a telephone caller's identity may be authenticated by circumstantial evidence).

¶ 23 In this case, the State presented not only evidence indicating that the text messages came from Otkovic's phone, but also evidence that could support a finding that Otkovic was in possession of the phone at the time the text messages were sent. The texts were sent from the phone number assigned to the white Blackberry police discovered in Otkovic's apartment, which Otkovic admitted was his. That phone matched Hawkins's description of the phone he saw Otkovic use during the robbery, and the robbery occurred during the same time frame when the text messages were sent. Although Otkovic's own testimony that Shields was also in the

---

7. Otkovic also raises arguments regarding prosecutorial misconduct and ineffective assistance of counsel. We are concerned that a number of statements made by the prosecutor in closing argument appear to have misstated the evidence. Trial counsel's failure to effectively use the phone records in support of Otkovic's case is also troublesome, as discussed in Judge Voros's concurring opinion. Taken together and considered in light of the erroneously excluded evidence, these errors further undermine our confidence in the verdict. However, we find it unnecessary to address these additional errors in detail because the exclusion of evidence that Hawkins was a fence alone warrants a new trial.

8. For the same reason, we deny Otkovic's rule 23B motion to remand the case for additional findings regarding his ineffective assistance of counsel claims. *See generally* Utah R.App..P. 23B.

car when they went to the ATM and that he let Shields use his phone during that time period tended to contradict Hawkins's testimony, the contradictory testimony goes to the weight of the evidence, not its admissibility. By presenting evidence that the phone from which the text messages originated belonged to Otkovic and that he had possession of it at the time the messages were sent, the State met its burden to make a prima facie showing of authenticity. *See United States v. Tank*, 200 F.3d 627, 630 (9th Cir.2000) (explaining that under the substantively identical rule 901 of the Federal Rules of Evidence, "[t]he government need only make a prima facie showing of authenticity ... so that a reasonable juror could find in favor of authenticity or identification" (citation and internal quotation marks omitted)). Accordingly, the trial court did not exceed its discretion in determining that the evidence was sufficient to authenticate the text messages.[9]

## B. Loss or Destruction of the ATM Video

■ ¶ 24 Otkovic also argues that the case should be dismissed based on the loss or destruction of the ATM video. The destruction of exculpatory evidence may support a motion to dismiss criminal charges. *State v. Tiedemann*, 2007 UT 49, ¶ 41, 162 P.3d 1106; *see also* Utah R.Crim. P. 16(a)(4) (requiring that the prosecutor disclose "evidence known to the prosecutor that tends to negate the guilt of the accused"). However, to prevail on such a motion, a defendant must first demonstrate, as a threshold matter, that there is "a reasonable probability that lost or destroyed evidence would be exculpatory." *Tiedemann*, 2007 UT 49, ¶ 44, 162 P.3d 1106. Otkovic has failed to make such a threshold showing.[10] The only evidence regarding the contents of the video is the email from the bank, which states, "Now you can see that there is someone else in the car but there is no way to tell who it is since the camera is (theoretically) aimed at the driver. The driver also puts his hands up periodically." [11] While there is certainly a possibility that a video of the ATM transaction could have been exculpatory, there is nothing in the record from which we can conclude that there was a reasonable probability of such an outcome. *Cf. State v. Gulbransen*, 2005 UT 7, ¶¶ 46–47, 106 P.3d 734 (holding that a defendant was not entitled to a remedy where laboratory evidence that was only "potentially useful," in that it "might have exonerated the defendant" upon testing, was lost by the State Crime Lab (emphasis, citation, and internal quotation marks omitted)). Indeed, the email suggests otherwise. If the video showed Hawkins putting up his hands, that could actually corroborate Hawkins's story that he was held at gunpoint. Furthermore, since it was impossible to identify the passenger, there would be no way to know whether it was Otkovic, Shields, or the al-

---

**9.** The trial court also did not err in rejecting Otkovic's hearsay argument. If the jury determined that the texts were sent by Otkovic, then the texts would not be hearsay. *See generally* Utah R. Evid. 801(d)(2), (d)(2)(A) (providing that a statement "offered against an opposing party" and "made by the party in an individual or representative capacity" is not hearsay). If the jury determined that the texts were sent by someone other than Otkovic, then it could not possibly determine that Otkovic had made the admissions conveyed in the text messages.

**10.** Because Otkovic has failed to demonstrate a reasonable probability that the evidence was exculpatory, we need not examine the extent of the State's duty, if any, to obtain evidence before it is destroyed by a third party. However, we do observe that other jurisdictions that have considered the issue have declined to impose such a duty. *See, e.g., State v. Allum*, 2005 MT 150, ¶¶ 34–35, 327 Mont. 363, 114 P.3d 233 (holding that the prosecution's failure to obtain bank sur-

veillance video before it was destroyed by the bank did not violate the prosecution's duty to disclose exculpatory evidence); *People v. Banks*, 2 A.D.3d 226, 768 N.Y.S.2d 467, 468 (2003) ("The People have no constitutional or statutory duty to acquire, or prevent the destruction of, evidence generated and possessed by private parties....").

**11.** The State maintains that the bank representative could be describing the photographs that were attached to the email and that there is no indication that any video actually existed. Given that the photographs received by police apparently did not portray either Hawkins putting his hands up or a passenger in the vehicle, the State's position is questionable. We need not resolve this question, however, and simply assume, for purposes of our analysis, that the bank had a video recording in its possession at some point and that the police either misplaced or never received it.

leged female accomplice.[12] Because Otkovic cannot make the threshold showing that the video had a reasonable probability of being exculpatory, the trial court correctly declined to analyze the evidence further, *see generally Tiedemann*, 2007 UT 49, ¶¶ 44–45, 162 P.3d 1106 (outlining the sliding-scale test trial courts are required to engage in once the threshold showing is made), or to dismiss the case based on destruction of evidence.[13]

## CONCLUSION

¶ 25 We conclude that evidence of Hawkins's history as a fence was improperly limited under rule 403 of the Utah Rules of Evidence. We therefore reverse Otkovic's convictions and remand for a new trial. We further determine that the trial court did not err in concluding that the text messages were sufficiently authenticated to be admissible or in declining to dismiss the case based on the loss of the ATM video.

VOROS, Judge (concurring):

¶ 26 I concur in the lead opinion. I write separately to mention an additional issue that, together with the rule 403 issue identified by the majority opinion, undermines my confidence in the outcome of this trial.

¶ 27 Something went down the night of May 24, 2009. According to Otkovic, he delivered merchandise to Hawkins, who paid him approximately $1,600 for it. Otkovic claims Shields was also present. This transaction was not unusual, Otkovic maintains, as Hawkins ran a fencing operation, and Otkovic and Shields regularly supplied him with stolen electronics for resale. When picked up by police, Otkovic explains, he lied about having met with Hawkins that night for fear the police would discover his role in the fencing operation.

¶ 28 According to Hawkins, Otkovic and a woman robbed him at gunpoint as Otkovic live-texted the robbery to Shields. Hawkins denied running a fencing operation, denied having received stolen goods, and denied having previously met Otkovic (other than at a single meeting in which Otkovic gave a different name).

¶ 29 As the majority opinion explains, excluded evidence of Hawkins's fencing operation would have supported Otkovic's version of events and discredited Hawkins's. But Otkovic claims many other irregularities at trial. In particular, he contends that his trial counsel failed to exploit telephone records from Hawkins's cell phone.

¶ 30 The phone records are telling. The incident occurred around 8:00 p.m. on May 24, 2009. But Hawkins called Shields's number at 4:04 p.m. (a four-minute call), then Otkovic's number at 4:10 p.m. (also a four-minute call). Hawkins called Otkovic's number again at 6:55 p.m. (a two-minute call), and Otkovic's number called Hawkins at 7:11 p.m. (a one-minute call) and again at 7:35 p.m. (a one-minute call). Hawkins also received two text messages from Otkovic's number at 1:55 p.m., texted Otkovic's number at 3:01 p.m., and received another text from Otkovic's number at 3:08 p.m. These calls and texts undermine Hawkins's testimony that he did not know Otkovic before the robbery. They also cast doubt on the authenticity of the robbery texts, which suggest that Hawkins did not have Otkovic's number until Shields gave it to him after the incident.

¶ 31 Otkovic credits his trial counsel with introducing these phone records but claims that not using them to impeach Hawkins's testimony constituted ineffective assistance of counsel. To succeed on a claim of ineffective assistance of counsel, a defendant must show both "that counsel's representation fell below an objective standard of reasonable-

---

**12.** Because the passenger was apparently unidentifiable, it would not even help for the video to show someone texting, since the person texting could be either Shields, Otkovic, or the female accomplice.

**13.** For the same reason, Otkovic cannot demonstrate prejudice in conjunction with his alternative claim that his counsel performed ineffectively by failing to obtain the ATM photographs and video directly from the bank. *See generally State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (explaining that an ineffective assistance claim requires a showing "that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case" (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))).

ness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also State v. Clark,* 2004 UT 25, ¶ 6, 89 P.3d 162.

¶ 32 The State does not contend that trial counsel's performance fell within the wide range of professional assistance. Rather, it contends that Otkovic cannot show a reasonable probability of a different result for at least two reasons. First, the State asserts, "the alleged inconsistency is likely more illusory than real" because "Hawkins testified that he mistakenly believed he was communicating with Shields." However, a jury aware of the phone records might reasonably have questioned whether Hawkins could converse by phone with Shields for four minutes, immediately call Otkovic's number, and, thinking he was again speaking with Shields, converse for another four minutes with a stranger who, as it happens, was born and raised in Croatia.

¶ 33 Second, the State argues that in any event, other evidence firmly established Otkovic's guilt. This evidence included texts sent from Otkovic's phone during the robbery, a photograph of Hawkins's driver license found on Otkovic's phone, a gun matching the one Hawkins described and cash in the approximate amount Hawkins reported as stolen found in Otkovic's bedroom, and Otkovic's false statements to police. However, the cash, the fact that Hawkins could describe Otkovic's gun, and Otkovic's false police statements are all consistent with Otkovic's version of events, namely that he was selling stolen merchandise to a familiar associate. Furthermore, while the texts incriminate Otkovic, they also imply that Hawkins obtained Otkovic's phone number from Shields after the incident—an implication refuted by phone records showing that Hawkins had placed calls to that number before the incident. The State is correct that how Hawkins obtained Otkovic's number was a "tangential detail." But the fact that Hawkins called Shields before the incident and spoke for four minutes, then hung up and called Otkovic and spoke for another four minutes is more than a detail—it undermines Hawkins's version of events and corroborates Otkovic's.

¶ 34 Otkovic's trial counsel never brought these discrepancies to the jury's attention. This omission, especially viewed in tandem with the exclusion of evidence of Hawkins's fencing operation, undermines my confidence in the trial outcome.