**2022 UT App 112**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
HARLEY GREGORY WELSH,
Appellant.

Amended Opinion[1]
No. 20190833-CA
Filed August 29, 2022

Third District Court, Salt Lake Department
The Honorable Adam T. Mow
No. 181902848

Robert T. Denny, Attorney for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN FORSTER and JUSTICE DIANA
HAGEN concurred.[2]

---

1. This Amended Opinion replaces the Opinion that was issued in case 20190833-CA issued on August 11, 2022. What was previously marked as footnote 6 (and which is now footnote 7) has been revised in response to Welsh's petition for rehearing.

2. Justice Diana Hagen began her work on this case as a member of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on the case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

TENNEY, Judge:

¶1    Harley Welsh broke into his ex-girlfriend's (Victim) apartment, kicked down her bathroom door, and dragged her out of the room by her ankles. Victim's roommate (Roommate) personally witnessed these events. A few hours later, Victim made several incriminating statements about Welsh while at a hospital emergency room. And a few hours after that, Victim showed a police officer several texts that Welsh had allegedly sent her that night that contained incriminating information.

¶2    A jury later convicted Welsh of several crimes stemming from his attack on Victim. On appeal, Welsh argues that the district court should not have admitted either the text messages or the statements that Victim made at the hospital. For the reasons set forth below, we affirm.

BACKGROUND[3]

*Welsh Breaks into Victim's Apartment*

¶3    On a late afternoon in October 2017, Roommate was at the apartment she shared with Victim when she heard somebody walk loudly past her bedroom window. She then heard "banging" on her front door, so she went to the door and asked who it was. The person banging did not respond, even after Roommate "asked 4 or 5 times." A man on the other side of the door finally said, "Does it matter who it is?" Roommate responded, "Yes, because I'm not going to open the door unless you tell me who it is." The man said that he was "Harley." Roommate knew that Victim had dated a man named Harley Welsh, but she told the

---

3. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Maese*, 2010 UT App 106, n.2, 236 P.3d 155.

man at the door that Victim wasn't there so that he would go away.

¶4     The man didn't say anything in response. Instead, he smashed through the door, which "exploded inward" and "knocked" Roommate to the floor. Harley Welsh then entered the apartment.

¶5     Welsh was wearing gloves and had a tire iron in his hand. He seemed "pissed off" and "[v]ery angry," and he asked Roommate, "Where the fuck is [Victim]?" Roommate again told him that Victim wasn't there.

¶6     But Victim was in the apartment, and after hearing the initial commotion, she had tried hiding in the bathroom by turning out the light and shutting the door most of the way. When Welsh began walking through the apartment, Victim pushed the door shut. Welsh realized that somebody was in the bathroom, so he "kicked the door" down.

¶7     Welsh then dragged Victim out of the bathroom by her ankles. As he did, Victim was "[k]icking and screaming," telling Welsh, "I'm not going with you." Welsh replied, "We're leaving." When Victim implored him to "[c]alm down or somebody's going to call the cops," Welsh responded, "That's okay. Let them call the cops because they'll just show up to two bloody corpses."

¶8     Welsh took a piece of cord from the living room, cut it up with his pocketknife, and asked Victim "if she wanted him to tie her up." Victim said that she didn't want him to tie her up and reiterated "that she wasn't leaving with him." Welsh then "attempted to tie her ankles," and while he did, Victim told him, "No. Stop. You're hurting me."

¶9     Roommate witnessed all this from the floor where she had been lying since Welsh broke in. Roommate later testified that she thought Welsh was "going to smash [her] brains with a tire iron"

and that she was "going to die." She also explained that she made no attempts to protect Victim because she was afraid. Instead, as Welsh and Victim continued to struggle, Roommate crawled to her bedroom. Once there, she heard Welsh and Victim continue to argue. Somewhere between fifteen to thirty minutes later, the apartment fell silent, and Roommate could tell that Welsh and Victim were now gone. At that point, Roommate felt "sick" and "freaked out." But she didn't call 911 because she was still afraid.

*Victim and Welsh Arrive at the Emergency Room*

¶10    Around 5:30 that evening, Victim arrived at the emergency room of a nearby hospital and was treated by an emergency physician (Doctor). A man was with Victim, and Doctor later identified that man as Welsh.

¶11    Victim's medical chart indicated that she "registered to be seen for an ATV accident." But Doctor thought that "her appearance and demeanor seemed different than . . . would [be] expected from someone that had recently been in an accident." In particular, Doctor thought that Victim "seemed frightened" of Welsh, who was still "in the room with her." The nurse (Nurse) who was helping Victim also thought that Victim "seemed scared and anxious."

¶12    After initially giving "haltered and stuttered" answers to Doctor's questions, Victim "declar[ed] that [Welsh] was not allowed to be there and that he needed to get out of the room." When hospital staff asked Welsh to leave, however, Welsh was "resistant and stayed seated. It required a repeated effort of verbal indication that he should leave the room."

¶13    Welsh eventually left the room, after which Nurse took Victim to a different room to "do a more proper examination." But while Nurse and Victim were in the new room, they found Welsh "hiding behind the door and behind the curtain." When Victim saw him, she screamed and ran across the emergency department

into another room. Welsh "claimed that he had every right to be in the room and that he didn't have to leave." The staff "got security involved" to get Welsh "out of the room," and Nurse went to find Victim. Nurse found Victim hiding in an empty room. Victim "seemed scared" and "said she didn't want [Welsh] anywhere near her." Nurse then took Victim to a new room and registered her under a pseudonym.

¶14   Victim spoke with Doctor again in the new room, and she was now "more open in her response[s]" to his questions. She told him that she was there because Welsh "had been harming her," not because of an ATV accident. When Doctor asked for clarification, Victim "indicated that he had harmed her, grasping her by the throat and shaking her." Victim also said, "[he] got ahold of me again" and "he had kidnapped me."[4]

¶15   After examining Victim, Doctor concluded that she "hadn't sustained a serious injury" and that there wasn't "any marking or bruising, signs of any fractures, or significant injuries at the time." Based on Victim's claims and Welsh's "demeanor," however, Doctor diagnosed Victim with "domestic abuse of adult" and "post traumatic stress disorder."

*Welsh Returns to the Apartment*

¶16   Sometime later that night, Welsh went back to Victim's apartment. He told Roommate that he was there to get Victim's clothing, but Roommate "told him he couldn't have it and that he wasn't welcome in [her] house." Welsh then asked Roommate "whose stuff was in the living room." Roommate responded that

---

4. There was some discrepancy in the testimony at trial about whether Welsh left before or after the conversation between Victim and Doctor described above. Regardless, Doctor and Nurse agreed that Welsh was in and out of various rooms in the hospital and that Welsh left only after security became involved.

the stuff belonged to Victim's brother (Brother), who also lived in the apartment.

¶17    After Welsh left, Brother arrived and noticed the front door was kicked in. Roommate "was in hysterics, freaking out, crying," and she kept saying to Brother, "He took your sister. He took your sister." Brother "immediately" knew that Roommate was talking about Welsh. When Brother walked through the apartment, he saw that the bathroom was "ransacked" and that the bathroom door was "broken completely off the hinges." To Brother, the apartment looked "terrorized" and like "a mess."

¶18    Brother called 911, and as he was talking to the emergency operator, he went out to the apartment's balcony. While there, he saw "Welsh not even 30 yards away." Brother and Welsh locked eyes as the police came "around the corner," at which point Welsh "proceeded to take off."

*Investigation and Text Messages*

¶19    One of the responding officers (Officer) took photographs of what he found in the apartment. These included photographs of the splintered front door frame; the front door's strike plate, which was lying on the floor; the bathroom door, which was broken off its hinges; a cut-up cord on the living room floor; and a black glove lying near the cut-up cord, which Roommate later identified as one of the gloves that Welsh was wearing when he broke into the apartment.

¶20    After photographing the scene, Officer spoke with Victim on the phone. At this point, Victim had left the hospital and was now at a friend's apartment. Later that night, Officer went and interviewed Victim in person. When he met her, Officer thought that Victim seemed "scared and paranoid." Officer also noticed some redness on Victim's neck and an injury on one of her hands. Although these injuries "were not overwhelming," they "appear[ed] to be fresh," so Officer photographed them.

¶21   During the interview, Victim showed Officer a series of text messages on her phone. They were sent from someone who was identified as "Harleyy" in her contacts, and there was a phone number linked to that contact. A timestamp indicated that Victim had received the first text at 9:08 p.m. that night, and one of the later texts had a timestamp of 9:20 p.m. Officer took photographs of those texts, and he later testified that he took the photographs at 9:27 p.m.

¶22   Those text messages, without alteration, read as follows:

- "So you reported me to the police now? And now there looking for me."

- "Am I right"

- "Liar your brother isn't in orem"

- "DID U CALL THE COPS AND REPORT ME? YES OR NO?"

- "WHEN WE BOTH AGREE ON THINGS AND GET BACK TO LIVING A REAL LIFE"

- "I DO TRULY LOVE YOU AND I JUST WANTED MY WIFE AND NOW THIS AGAIN. I JUST WANTED YOU TO HOLD ME TIGHTLY AND SAY THINGS WILL GET BETTER"

- "I KNOW YOU WERE HOME AND THE COPS WERE THERE LOOKING. SO DID YOU FILE CHARGES ON ME AND WHAT KIND DID YOU PRESS AGAINST ME? IF YOUR RE"

- "PORTING THESE THEN THAT'S GOOD YOU GROW A BIGGER PAIR. AND THAT'S WHY I TRULY LOVE YOU."

- "Yes or No"

- "Just ignore me like you've done our whole relationship."

- "to put your hands on me and lie to the cops about me doing whatever your herion high conjured up."

- "So stop hiding from the fact that you caused all this due to. Yes your herion addiction. So dont say its all me. And Im sorry you had"

- "And just so it states that you initiated all that you have said against me and your judgment is impaired all day and evening"

¶23 After Victim showed Officer these messages, Officer searched for Welsh's name in the police department's database. In that database, Officer found a file on Welsh that included a contact phone number. That phone number matched the phone number that had sent the text messages to Victim's phone.

*Trial*

¶24 The State charged Welsh with aggravated kidnapping; aggravated burglary; violation of a sentencing protective order; retaliation against a witness, victim, or informant; criminal mischief; and assault.

¶25 The case later went to trial, and the State called Roommate, Brother, Officer, Nurse, and Doctor as witnesses. The witnesses testified about the events as described above. Victim did not testify.

¶26 The district court made two evidentiary rulings that are central to this appeal. The first concerned the text messages that Welsh allegedly sent Victim after the attack. Before trial, the prosecutor filed a motion in limine asking to admit Officer's

photographs of those messages. The prosecutor argued that although Victim would not testify, Officer could authenticate the messages by testifying that he took the photographs and describing the surrounding circumstances. In response, Welsh's trial counsel (Trial Counsel) argued that Officer could not authenticate the texts because his knowledge of the messages was based on hearsay from Victim.

¶27 The court deferred ruling on this issue until it could hear Officer's testimony. At trial, Officer explained how he matched the phone number for the "Harleyy" contact on Victim's phone to the phone number listed for Welsh in the police database. At that point, the court allowed Trial Counsel to voir dire Officer. During voir dire, Officer explained that "[a]ll officers" in his department have access to the database and can "edit things and remove things." Trial Counsel then argued to the court that the text messages could not "be authenticated under the rules of evidence" because "there is no keeper of the records."

¶28 The court overruled Trial Counsel's authentication objection, and it did so based on Officer's testimony about "how he had linked the number on the text message[s] with Mr. Welsh." Based on this authentication, the court then admitted the messages over the hearsay objection, concluding that they qualified as "a statement of the opposing party." *See* Utah R. Evid. 901; *see also id.* R. 801(d)(2).

¶29 The second ruling concerned the admissibility of the statements that Victim made to Doctor while at the emergency room. Before trial, the prosecutor moved to admit those statements. Trial Counsel then conceded that Victim's statements that Welsh "grabbed her by the neck" and "shook her" were admissible, but Trial Counsel objected to admission of the statements that "[he] got ahold of me again" and "he had kidnapped me." In response, the prosecutor argued that these statements were admissible through the medical diagnosis or treatment exception to the rule against hearsay. *See id.* R. 803(4).

¶30    The court ruled that both statements were admissible under this exception. With respect to the statement that "[he] got ahold of me again," the court ruled that this "seem[ed] to relate to the later report from [Victim] that she was grabbed by the neck and shook." And with respect to the statement that "he had kidnapped me," the court ruled that this fit the exception because it gave "context to how the other injuries were perhaps sustained and that there may have been some violent action in the process of kidnapping that would help to explain the nature of those injuries or illnesses."

¶31    At the close of trial, the jury acquitted Welsh of aggravated kidnapping, but it found him guilty on all other charges. After the court sentenced Welsh to prison terms for the offenses, Welsh timely appealed.

ISSUES AND STANDARDS OF REVIEW

¶32    Welsh raises two issues on appeal.

¶33    First, Welsh challenges the district court's determination that there was sufficient evidence to authenticate the text messages that he allegedly sent to Victim. We review this determination for an abuse of discretion. *See State v. Otkovic*, 2014 UT App 58, ¶ 12, 322 P.3d 746.

¶34    Second, Welsh challenges the court's decision to admit statements that Victim made to Doctor under the medical diagnosis exception to the hearsay rule. "When reviewing rulings on hearsay evidence, we review legal questions regarding admissibility for correctness, questions of fact for clear error, and the trial court's final ruling on admissibility for abuse of discretion." *State v. Guzman*, 2018 UT App 93, ¶ 10, 427 P.3d 401.

ANALYSIS

I. Authentication of the Text Messages

¶35 The district court determined that the State had sufficiently authenticated the text messages that Welsh allegedly sent to Victim on the night of the attack. Welsh now argues that this authentication determination was an abuse of discretion. We disagree.[5]

¶36 The proponent of "writings or other documentary evidence" must authenticate the evidence before it can be admitted. *State v. Jacques*, 924 P.2d 898, 900–01 (Utah Ct. App. 1996). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Utah R. Evid. 901(a). Notably, "proper authentication does not require conclusive proof," *State v. Wager*, 2016 UT App 97, ¶ 12, 372 P.3d 91 (quotation simplified), and the proponent has to make only "a prima facie showing of authenticity," *State v. Otkovic*, 2014 UT App 58, ¶ 23, 322 P.3d 746.

¶37 The "process of authentication must be distinguished from a finding of authenticity." *Jacques*, 924 P.2d at 901. The district court is responsible for the "process of authentication," whereby it "assess[es] whether there is evidence sufficient to support a jury finding of authenticity." *Id.* (quotation simplified). But "the jury is ultimately responsible for determining whether the evidence is in fact authentic once the evidence is admitted." *Id.*

¶38 Rule 901 of the Utah Rules of Evidence provides a non-exhaustive list of "examples" of the kinds of evidence that can

---

5. Based on the authentication ruling at issue, the district court admitted the texts as nonhearsay statements under rule 801(d)(2) of the Utah Rules of Evidence. Welsh does not separately challenge the application of that rule to these text messages.

"satisf[y]" the authenticity requirement. *See* Utah R. Evid. 901(b). This list includes "[t]estimony that an item is what it is claimed to be." *Id.* R. 901(b)(1). It also includes the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." *Id.* R. 901(b)(4).

¶39 Our decision in *Otkovic* is illustrative. There, we affirmed a district court's determination that the State had presented sufficient evidence to support a finding that certain text messages were sent by the defendant. *Otkovic*, 2014 UT App 58, ¶¶ 21–23. This included evidence showing that the texts in question "were sent from the phone number assigned to" a phone found in the defendant's apartment, that this same phone matched a witness's "description of the phone he saw" the defendant use during the crime, and that the crime "occurred during the same time frame when the text messages were sent." *Id.* ¶ 23. While acknowledging that there was some contrary evidence suggesting that somebody else had used the phone during the relevant time, we nevertheless determined that the contrary evidence went "to the weight of the evidence, not its admissibility." *Id.* We accordingly held that the district "court did not exceed its discretion in determining that the evidence was sufficient to authenticate the text messages." *Id.*

¶40 Here, Officer testified that the photographs of the texts accurately represented the texts that he saw on Victim's phone. *See* Utah R. Evid. 901(b)(1). Welsh does not challenge that assertion on appeal. Rather, Welsh contends that the "appearance, contents, substance, internal patterns, or other distinctive characteristics" of those texts, "taken together with all the circumstances," were insufficient to show that he was the one who authored the texts. *See id.* R. 901(b)(4).

¶41 We disagree. Contrary to Welsh's assertion, the State did present several pieces of evidence that, when combined, were sufficient to support a finding that Welsh authored the texts.

¶42 First, Roommate testified that Victim had previously dated Welsh, and Officer testified that these text messages were received by Victim on her phone and came from a person who was labeled in her contacts as "Harleyy" (which is, of course, Welsh's first name with an extra "y").[6]

¶43 Second, the phone number that sent the texts was listed as "one of [Welsh's] contact phone numbers" in a police database.[7]

---

6. Welsh argues that Victim's statement to Officer that the phone was hers was inadmissible hearsay. As the State correctly points out, however, this argument is unpreserved. While Welsh pointed to several places below where he argued that Officer didn't have personal knowledge that Welsh sent the text messages, he points to no place in the record (and we see none) where he separately argued that Officer could not testify that Victim told him that the phone was hers. Because of this, the argument is unpreserved. And because Welsh does not argue that a preservation exception applies, we do not address this argument. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443.

7. In his opening brief, Welsh asserts that Officer's "testimony that he matched the number on the phone with a Murray City Database is based on double-hearsay not subject to any exception." But Welsh never identifies the two steps involved in the alleged double hearsay, nor does he provide us with any argument or developed authority supporting his view that this was double hearsay. As a result, any argument that turns on double hearsay is inadequately briefed, and we accordingly decline to address it. *See* Utah R. App. P. 24(a)(8); *State v. Drommond*, 2020 UT 50, ¶ 134, 469 P.3d 1056. We reach the same result even if his argument is construed as a single hearsay argument. In the relevant passage from Welsh's opening brief, Welsh capably briefed an argument about why, in his view, the texts were not supported by enough corroborating information to

(continued…)

¶44    Third, the timing and content of the messages supported a finding that Welsh sent them. As noted, Welsh and Victim had previously had a romantic relationship, but their relationship had since ended. Then, just a few hours before these texts were sent, Welsh broke into Victim's apartment and tried to tie her up. And later that evening, after Welsh was separated from Victim at the hospital, Brother saw Welsh standing outside Victim's apartment, at which point Welsh "[took] off" when police came "around the corner."

¶45    The texts sent by "Harleyy" to Victim tracked these events. In those messages, the sender expressed his love for Victim and referred to "our whole relationship." The sender accused Victim of reporting him to police and claimed to know that "the cops" were now at her home "looking" for him. And the sender also called Victim a "[l]iar" because her "brother" wasn't in Orem. The texts thus communicated information that was particular to both Victim's relationship with Welsh and to things that had happened that evening involving Welsh. These corroborative circumstances supported a finding that Welsh had sent the texts.

¶46    Welsh nevertheless advances two main arguments for why the texts should not have been admitted. First, he argues that the court erred in admitting the texts because "the State did not have any witness with personal knowledge who could corroborate that

---

have been properly authenticated. Amidst that argument, Welsh included a paragraph about the purported unreliability of the police database; and in the middle of that paragraph, Welsh made a single-sentence assertion that, "without more, the information contained within this database is inadmissible hearsay." This sentence was supported by a single citation that directed us to rules 801 and 803 of the Utah Rules of Evidence. But Welsh provided no further argument or explanation about why the information within the database was hearsay to begin with, nor did he support such an argument with developed authority. We therefore decline to address it.

the text messages were sent from Welsh's number or that he was in possession of the phone associated with that number when they were sent." But as noted, personal knowledge is not the only way to authenticate evidence. *See* Utah R. Evid. 901(b). Instead, the rule itself lists the "appearance, contents, substance, internal patterns, or other distinctive characteristics" of an item as a separate means of authentication. *Id.* R. 901(b)(4).

¶47 Second, Welsh points to several potential deficiencies in the evidence. For example, he notes that while Officer photographed the texts, Officer did not have personal knowledge that Welsh was the sender. Welsh suggests that although the sender was "concerned about being reported to the police," there could have been other people associated with Victim who were worried about being reported to police. Welsh points out that the sender referred to Victim as "my wife," even though there was no evidence presented at trial that Victim and Welsh were ever married. He also points out that there was no evidence "in the record indicating that Brother had any connection to Orem or that [Victim] had told Welsh her brother was in Orem." And finally, Welsh contends that "it is impossible to know whether [the texts] were altered in any way or whether any messages were deleted" before Officer saw them.

¶48 These are all fair arguments, but they ultimately go "to the weight of the evidence, not its admissibility." *Otkovic*, 2014 UT App 58, ¶ 23. While a jury could have accepted them and concluded that the texts were not "in fact authentic," *Wager*, 2016 UT App 97, ¶ 12 (quotation simplified), the jury also could have accepted the State-favorable evidence recounted above and concluded that Welsh did send them.

¶49 What ultimately matters in this appeal is the question that was before the district court—the authentication of the text messages. Again, the court was responsible for the initial "process of authentication," whereby it was tasked with determining "whether there [was] evidence sufficient to support a jury finding

of authenticity." *Jacques*, 924 P.2d at 901 (quotation simplified). On that, we agree with the court that the State presented "evidence sufficient to support a finding that" the text messages were sent by Welsh. *See* Utah R. Evid. 901(a). The court therefore did not abuse its discretion when it determined that the texts were properly authenticated.

## II. Hearsay

¶50 Over Trial Counsel's objection, the district court allowed Doctor to repeat two of Victim's statements: "[he] got hold of me again" and "he had kidnapped me." The court agreed that the statements were hearsay, but it nevertheless admitted them under the exception for statements made for medical diagnosis or treatment. *See* Utah R. Evid. 803(4).

¶51 Welsh now challenges this ruling, arguing that the statements did not qualify under this exception because Victim did not make them "with an intent to facilitate medical diagnosis or treatment." But to obtain reversal, Welsh must show that he was prejudiced. *See* Utah R. Crim. P. 30(a). This requires a determination that, "absent the error, there was a reasonable likelihood of a result more favorable to the accused." *State v. Bell*, 770 P.2d 100, 106 (Utah 1988). Here, we need not decide whether the statements at issue qualified under the hearsay exception in question because we conclude that any error in admitting them was harmless. *See, e.g.*, *State v. Clark*, 2016 UT App 120, ¶ 15, 376 P.3d 1089.

¶52 A prejudice analysis like this one "is counterfactual." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86. "To decide whether a trial affected by [alleged] error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the [alleged] error." *Id.* The counterfactual analysis in this case thus requires us to consider what Welsh's trial would have looked like if Doctor had not testified that Victim told him that Welsh "got hold of me

again" and "had kidnapped me." We conclude that, even without those statements, there's no reasonable likelihood that there would have been a result more favorable to Welsh.

¶53 First, the jury would have still heard Roommate's firsthand account of what she saw when Welsh broke into the apartment. Again, Roommate testified that Welsh broke through the front door with sufficient force to knock her over and that he then entered with a tire iron in his gloved hand. She testified that Welsh walked through the apartment looking for Victim, and that when Welsh realized that Victim was hiding in the bathroom, he broke that door down too. She testified that she saw Welsh drag Victim out of the bathroom "[b]y her ankles" while Victim was "[k]icking and screaming." She testified that she saw Welsh cut up a cord and try to tie Victim's ankles, and she further testified that she heard Welsh say that if police were called, they would "show up to two bloody corpses."

¶54 Second, the jury would have still seen Officer's photographs of the apartment. Of note, these photographs showed the apartment's two broken doors, a cut-up cord, and a black glove, thus corroborating significant details from Roommate's account.

¶55 Third, the jury would also have still heard Nurse's and Doctor's descriptions of Victim's demeanor at the hospital, including their observations that Victim seemed "scared," "frightened," and "anxious." The jury would have heard that after Victim arrived at the emergency room, Victim "declar[ed]" that Welsh needed to leave. Nurse would have still testified that Welsh initially resisted leaving and that after Victim was moved to another room, they found Welsh hiding behind a curtain. Nurse would have still testified that Victim "screamed" when she saw Welsh and that security had to get Welsh "out of the room." The jury would have also heard how Victim was checked into a new room under a false name and that Victim "indicated that [Welsh]

had harmed her, grasping her by the throat and shaking her."[8] And the jury would have known that Doctor diagnosed Victim with "domestic abuse of adult" and "post traumatic stress disorder."

¶56   Fourth, the jury would have still heard Brother's testimony that when he arrived at the apartment later that night, Roommate was "in hysterics." And it would have heard Brother's testimony that he saw Welsh standing outside the apartment and "take off" when police came "around the corner."

¶57   Fifth, the jury would have still seen the photographs that Officer took of Victim's injuries.

¶58   And sixth, the jury would have still seen the text messages that Victim received from "Harleyy." As explained above, the State presented evidence sufficient to support a finding that those texts were sent by Welsh. And as also explained, those texts communicated information that was particular to both Victim's relationship with Welsh and to things that had happened that evening involving Welsh, and they further expressed concern from the sender about criminal charges.[9]

¶59   In a hypothetical trial in which the State was not permitted to use the challenged statements, all this evidence would still have been before the jury. Given the strength of this evidence, we see no reasonable likelihood that there would have been a more

8. Trial Counsel conceded that this particular statement was admissible under rule 803(4) of the Utah Rules of Evidence.

9. We've concluded that the texts were properly authenticated, so we've included them in this prejudice analysis. Even if there were some error in admitting the texts, however, we would still readily conclude that Welsh was not prejudiced by either their admission or the admission of the alleged hearsay because of the strength of the other evidence recounted in this opinion.

favorable result for Welsh had the jury not heard the challenged statements.

¶60     Welsh nevertheless responds on several fronts. First, he argues that the statement "he had kidnapped me" was particularly problematic given the criminal connotations associated with the term "kidnap." But he suffered no prejudice as a result of this accusation because the jury acquitted Welsh of the aggravated kidnapping charge. Even so, Welsh nonetheless argues that there is at least a "reasonable likelihood" that Victim's "colloquial use of the phrase 'kidnap' . . . prompted the jury to convict Welsh on the other charges." But given the strength of the other evidence, we still see no reasonable probability that the jury would have reached a different result on those charges without this statement.

¶61     Welsh also argues that "the statement that Welsh 'got ahold of [her] again,' is vague and ambiguous" and that "there is a reasonable likelihood the jury inferred that similar incidents had occurred in the past." But the contention that Victim's statement was "vague and ambiguous" cuts both ways—if the jury was indeed uncertain about what this meant, it seems just as likely that the jury would have assigned little weight to that statement.

¶62     Welsh further contends that Victim's statements made Roommate's story more believable and that there is a "reasonable likelihood" that the jury would not have believed Roommate's account without these statements. In support, Welsh points to alleged problems with Roommate's testimony. For example, he points out that the prosecutor referred to Roommate as "not a superwoman" and "not a great speaker." But regardless of whether Roommate was or was not a great speaker, she was a firsthand witness of the attack, and because Roommate testified at trial, the jury was in an advantaged position to directly evaluate her credibility. Moreover, Victim's statements to Doctor would not have been the most natural source of corroboration for Roommate's testimony anyway. Rather, Officer's photographs of

what he found at the apartment and Brother's testimony about the same scene were direct corroboration for many of her claims. Because of this, we don't see any probability that the perceived veracity of Roommate's account hinged on the statements that Victim later made at the hospital.

¶63 In short, even without the challenged statements, the jury would have heard a firsthand account of Welsh breaking into the apartment, dragging Victim out of the bathroom by her ankles, and attempting to tie her up, and it would have seen photographs corroborating that account. The jury would have heard how Victim showed up at a hospital a few hours later, scared and nervous, and also how Victim had to be hidden from Welsh at the hospital after he tried following her. And it would also have seen texts that she received from a person that seemed to be Welsh and that seemed to line up with the very events in question. In light of all this, we see no "reasonable likelihood" that Welsh would have received a different result without the challenged statements. *Bell*, 770 P.2d at 106. We therefore conclude that Welsh was not prejudiced by any error in admitting them.[10]

CONCLUSION

¶64 The district court did not abuse its discretion when it determined that the State presented sufficient evidence to support a finding that Welsh authored the text messages. Welsh also has not shown that he was prejudiced by the admission of Victim's challenged statements. We accordingly affirm his convictions.

---

10. Welsh also raised a cumulative error argument. Because there are not errors to accumulate, this doctrine is inapplicable. *See State v. Gonzales*, 2005 UT 72, ¶ 74, 125 P.3d 878.