**2024 UT App 100**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
TAYLOR JAMES GOODALL,
Appellant.

Opinion
No. 20210622-CA
Filed July 18, 2024

Seventh District Court, Price Department
The Honorable Don M. Torgerson
No. 191700160

Staci A. Visser and Ann Marie Taliaferro,
Attorneys for Appellant

Sean D. Reyes and Daniel W. Boyer,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

OLIVER, Judge:

¶1 Taylor James Goodall appeals his convictions for forcible sodomy and object rape. He first requests a remand to develop the record for a claim of prosecutorial and police misconduct. Goodall then argues that his *Miranda* waivers and incriminating statements were involuntary and that the trial court erred in admitting them. Next, Goodall argues that his attorneys rendered ineffective assistance by requesting a jury instruction that he claims labeled his incriminating statements as a "confession." Finally, Goodall argues that an officer should not have been allowed to testify about the credibility and consistency of some

witnesses' statements. Because Goodall has not established any claims of error or ineffective assistance, we affirm his convictions.

## BACKGROUND[1]

### *The Incident*

¶2      In March 2019, Jenny[2] reported to the police that her boyfriend, Goodall, had raped her the previous night. The two had been dating for nine months and lived together with a friend (Roommate) in a small trailer. Jenny had heard rumors that Goodall was seeing another woman. One morning, when Jenny confronted Goodall about the rumors, he became "defensive" and "agitated." They later texted each other about whether they should end their relationship. When Jenny got home from work and called Goodall to see what time he would be back, he sounded "really irritable" and "standoffish." Goodall told Jenny he would talk to her "when he felt like it," so Jenny "just went to bed."

¶3      Around midnight, Jenny woke up to Goodall saying, "You're going to do what I say or else." He took the blanket off Jenny and told her to take off her clothes. Jenny was "groggy" and thought at first they were going to have "make-up sex," so she took off her pants and underwear. Jenny was alarmed, however, when Goodall lifted her leg with "his arm on [her] ankle," put his other hand on her throat, and penetrated her anus with his penis, "dry." Jenny "told him to stop because he knew that [she] did not like anal" sex, but Goodall continued thrusting "hard" "[a]s far as he could go" for a "couple of minutes," which "felt like forever"

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Liti*, 2015 UT App 186, ¶ 3 n.2, 355 P.3d 1078 (cleaned up).

2. A pseudonym.

to Jenny. Jenny tried to get out from under him, but Goodall pushed her legs back and kept his hand around her throat.

¶4 Next, Goodall pulled his penis out and "shoved" four fingers into Jenny's vagina, knuckle-deep. Goodall "curled his fingers and twisted them." Jenny said, "Ow," and told him to stop because it was causing "a lot of pain," but "he would not stop." Then, Goodall took those same fingers and "shoved" them into her mouth. It "disgusted" Jenny. She "told him to stop" and that she needed to use the bathroom. Jenny passed Roommate on her way to the bathroom but did not wake him up or call police because she "didn't know what to do." While Jenny was in the bathroom, she and Goodall exchanged the following texts:

| | |
|---|---|
| Goodall: | Get in here |
| | Now |
| Jenny: | I will give me a sec, I'm still trying to urinate my bladder is hurting me |
| Goodall: | O well |
| | I'm still mad |
| Jenny: | I know |
| Goodall: | Exactly |
| | And [if you] say it hurts [too] much we are over as well |
| Jenny: | Okay |
| Goodall: | Hurry |
| Jenny: | Okay |

> Goodall:     How much longer

Jenny returned to the bedroom because she "didn't want any conflict."

¶5     Goodall then demanded oral sex from Jenny. Grabbing her hair, Goodall shoved Jenny's face "in front of his penis and started to thrust, which made [her] gag." Jenny did not want his penis in her mouth because it had just been in her anus—the act felt "disgusting" and "revolting" to her. Goodall ejaculated in Jenny's mouth and told her to swallow it. Jenny instead "spit it out." Afterwards, Goodall told Jenny to lie in "bed with him," which she did, feeling "scared," "disgusted," and "violated."

¶6     The next morning, when Goodall told Jenny he was breaking up with her, she was upset because she loved him and wanted to make it work. After Goodall left, Jenny told Roommate that Goodall had raped her. Roommate responded that he had "heard whimpering in the night in the bedroom" during the "brief moments when [he] wasn't listening to music" with his earphones. Jenny also told her work manager and two friends about the rape. At the suggestion of one of her friends, Jenny contacted the police.

*The Investigation*

¶7     The Helper City Police Chief (the Chief) responded to Jenny's 911 call and took her statement. Afterward, the Chief drove Jenny to the trailer to collect her clothing from the previous night and then to the hospital, where a sexual assault nurse examiner conducted an exam. The exam revealed no visible injuries other than a small bruise on Jenny's right shin.

¶8     That evening, Goodall called the police to ask about why they were at the trailer that day. Goodall told the officer that answered (Officer) that he was willing to speak with the police, so

Officer picked him up from the trailer and drove him to the Helper Police Station, where Officer informed Goodall that Jenny had made "serious allegations" against him. Officer read Goodall his *Miranda* rights, and Goodall filled out a waiver form. According to Officer, Goodall "seemed pretty clear about the rights" and "wanted to talk." Goodall confirmed that he and Jenny "had sexual intercourse the night before," and he "believed she had been fine with all of it."

¶9     Officer notified the Chief that he was interviewing Goodall, so the Chief drove over and joined Officer.[3] Goodall gave his account of what happened that night, saying he and Jenny "both agreed upon having sex" and had started with vaginal sex until she said "ow." Goodall then claimed he asked Jenny if they could have anal sex and she agreed. He related that during the anal sex, Jenny "started to wince in pain again." Goodall also admitted he vaginally penetrated Jenny with four fingers.

¶10     The Chief, who knew Goodall's brother and had "interacted with him [and] his family . . . quite regularly," asked Goodall if he would be willing to take a polygraph test. Goodall agreed and rode with the Chief to the Carbon County Administration Building, approximately ten minutes away. When they arrived, the Chief read Goodall his *Miranda* rights again and gave him a waiver form, which Goodall initialed and signed.

¶11     Goodall also signed a pre-test waiver that advised him that he was "free to leave" or end the test whenever he wished and that "any and all parts of [the] polygraph examination and interview" "will be used for whatever legal purposes the Helper City Police Department deems necessary" and the results "will be released to [the Chief] or any others required by law." By signing the waiver, Goodall represented that he was "in good mental and

---

3. An audio recording was made of this initial interview with Goodall, and parts of it were played for the jury.

physical condition" and did not know of any "mental or physical ailment" that would "be impaired by the interview or examination." Goodall also represented that he was taking the test "voluntarily, without threats, duress, coercion, force, or promise of immunity or reward." When the Chief asked Goodall how much sleep he had gotten the previous night and if he had eaten that day, Goodall responded that he had slept "[e]ight, nine hours" and had eaten breakfast but not lunch. Goodall stated he was in overall good health except for having bipolar disorder, which caused him "severe anxiety" and "chronic depression."

¶12   After Goodall took the polygraph test, the Chief reviewed the results and determined that Goodall was lying. The Chief told Goodall he had "failed the test" and then compared a prosecutor to a "secondary umpire" in baseball, encouraging Goodall to "own up" to his mistake instead of denying it and "bumping bellies with the secondary umpire." Approximately five minutes into this post-polygraph interview, Goodall admitted he "did make a bad decision" and started sobbing, saying he had "never wanted to hurt [Jenny]." The Chief asked what he meant and Goodall explained, "I told her to . . . [do] anal . . . and she might not have like[d] it. . . . She has expressed to me before she didn't like it." Goodall admitted that he and Jenny had started with anal sex, contrary to what he had told Officer earlier. When asked if Jenny agreed to the anal sex, Goodall replied, "She didn't really tell me; she did shake her head yes. But I, I really don't, I swear on my mother's grave." As for the oral sex that night, Goodall said he "might've went a little too far" and that he was "the one who caused her to gag" when he "pushed her head down." Goodall also admitted he had ejaculated in Jenny's mouth.

¶13   The State charged Goodall with three first-degree felonies: two counts of forcible sodomy and one count of object rape. Goodall filed a motion to suppress the polygraph test results, along with his statements made after the polygraph. The State stipulated to excluding the polygraph test results but opposed

exclusion of Goodall's post-polygraph statements. The trial court accepted the stipulation, held an evidentiary hearing, and heard oral argument on whether to exclude Goodall's post-polygraph statements. The court denied the motion, ruling that Goodall "voluntarily waived his Miranda rights" and "presented no evidence that he was overly compliant or more susceptible to coercion" and that no "improper threats, implied promises, false friend, or coercive police tactics were present."

*The Trial*

¶14　At trial, the jury heard Jenny testify about the assault as described above. On cross-examination, Jenny admitted that she and Goodall "frequently engaged in rough sex," which she defined as "hair pulling, biting, back clawing, [and] slapping." Goodall's attorneys (Counsel) asked if Jenny had been "preparing for today's testimony." Jenny replied that her attorney, two county prosecutors, a detective, the Chief, and a victim's advocate helped her prepare. The State also elicited testimony from Officer, the Chief, Roommate, and additional witnesses.

¶15　Goodall's defense focused on consent and on the Chief, portraying him as overly eager to get a conviction. Counsel urged the jury to make its decision "based upon the evidence, not based upon an officer who has tunnel vision, who wants to go a certain direction and clearly creates his investigation to reflect that." During cross-examination of the Chief, Counsel sought to minimize discrepancies in Goodall's interviews, to which the Chief replied, "It goes back to credibility, I guess, of [Goodall] when I was talking to him . . . there [were] a few inconsistencies that I noticed . . . ." Counsel also asked the Chief about a recorded phone call between Jenny and Goodall's cousin:

> Counsel:　Were there any inconsistencies in what [Jenny] told [Goodall's cousin]

| | |
|---|---|
| | versus what she told you in your interview? |
| The Chief: | [Jenny] was very consistent in that recorded phone conversation by [the cousin]. |
| Counsel: | Okay. Was her statements [sic] consistent with what the evidence showed? |
| The Chief: | All I can say is [Jenny] was consistent in the statements she provided me in that recorded phone interview. |

¶16   The State asked the Chief about his brief interaction with Roommate while Jenny was collecting her clothing at the trailer. When asked what Roommate's "demeanor was like while [the Chief was] speaking with him," the Chief answered, "He seemed articulate. He seemed knowledgeable, I guess." When the State asked if Roommate seemed "questionable in what he was saying at all," the Chief replied, "Not at all."

¶17   At the close of the State's case, Counsel moved for a directed verdict, arguing there was possible witness tampering since Jenny testified that her attorney, a victim's advocate, a detective, the Chief, and two county prosecutors had been "prepping her for her testimony." The court denied the motion, finding a lack of evidence "beyond just suspicion" to support it.

¶18   Counsel recalled the Chief to the witness stand during Goodall's case-in-chief and sought to emphasize alleged inconsistencies in Jenny's statements. The Chief responded that during his "three interactions or more with [Jenny], she was totally consistent every single time. In her written statement, in

my official police report that I wrote, in my probabl[e] cause statement, she was consistent."

¶19   Before sending the jury to deliberate, the trial court gave the jury instructions, including one requested by Counsel (Instruction 34). Unlike most of the other jury instructions, Instruction 34 did not have a heading, and it stated as follows:

> When the Prosecution introduces evidence that the defendant confessed, that confession must be viewed in light of its overall trustworthiness. There are several factors that you may consider when deciding whether the statement is sufficiently trustworthy:. . . .
>
> If you find that there is sufficient evidence to believe that the defendant's statement is trustworthy, then you may consider it as evidence among the other evidence presented. However, if you find that there is not sufficient evidence to establish that the defendant's statement is trustworthy, you may disregard the statement.

¶20   The jury found Goodall guilty of forcible sodomy (based on the anal sex), not guilty of forcible sodomy (based on the oral sex), and guilty of object rape (based on the digital penetration). The trial court later sentenced Goodall to two concurrent terms of five years to life in prison.

¶21   After Goodall timely appealed, he filed a motion to stay his appeal so he could develop evidence of "misconduct" by the prosecution in the trial court. We denied that motion, noting that with "the exception of rule 23B [for ineffective assistance of counsel], which is not applicable here, the Utah Rules of Appellate Procedure do not provide a mechanism to develop evidence for

an appeal after a notice of appeal has been filed." Goodall filed a motion to reconsider that order, which we also denied.

ISSUES AND STANDARDS OF REVIEW

¶22 Goodall raises four issues on appeal. First, Goodall requests that this court grant him the opportunity to develop a record of prosecutorial misconduct "by whatever remedy." Because Goodall's request to develop the record for such a claim during the pendency of this appeal "is procedurally improper," we "need not address the standard[] of review applicable" to this issue. *State v. Robinson*, 2023 UT 25, ¶ 11, 540 P.3d 614.

¶23 Second, Goodall asserts that his *Miranda* waivers and incriminating statements were involuntary. "In reviewing a trial court's determination on the voluntariness of a confession, we apply a bifurcated standard of review." *State v. Rettenberger*, 1999 UT 80, ¶ 10, 984 P.2d 1009 (cleaned up). "The ultimate determination of voluntariness is a legal question" reviewed for correctness, and a trial court's factual findings are reviewed for clear error. *Id.*

¶24 Third, Goodall contends that Counsel rendered constitutionally ineffective assistance by requesting a jury instruction that, according to Goodall, characterized his statements to law enforcement as a "confession." "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Calvert*, 2017 UT App 212, ¶ 17, 407 P.3d 1098 (cleaned up).

¶25 Finally, Goodall asserts that improper evidence was admitted under rule 608(a) of the Utah Rules of Evidence in relation to the Chief's testimony. Goodall admits he failed to

preserve this issue by raising it below and asks us to review it under "both the plain error and ineffective assistance of counsel exceptions to our preservation requirement." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657. "Plain error is a question of law reviewed for correctness." *Id.* (cleaned up). And, again, "we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Id.* (cleaned up).

ANALYSIS

I. Prosecutorial Misconduct

¶26 Goodall argues that his state constitutional rights to appeal, have counsel, and be afforded due process will be violated if he is denied an opportunity to develop a record of alleged prosecutorial misconduct during this direct appeal. Goodall acknowledges that "the record is insufficient to raise known claims of prosecutorial misconduct." The State points out that this is Goodall's second request for reconsideration of our ruling denying his request to stay his appeal so he can develop the record on prosecutorial misconduct, and that the appellate rules allow the development of evidence outside the record after filing a notice of appeal only for a claim of ineffective assistance of counsel. We agree with the State.

¶27 The Utah Constitution guarantees criminal defendants a number of rights, including the right to appeal, *see* Utah Const. art. 1, § 12, the right to counsel, *see id.*, and the right to due process, *see id.* art. 1, § 7. The Utah Rules of Appellate Procedure outline the contours of the right to appeal. Under those rules, parties to an appeal may not develop extra-record evidence after filing the notice of appeal. *See* Utah R. App. P. 11(a). Rule 23B is the only exception to that rule and allows an appellate court to grant criminal defendants a limited remand of their case to the trial court so the record may be developed on an ineffective assistance

of counsel claim. *See id.* R. 23B(a). This procedure is available only for findings of fact that are "necessary for the appellate court's determination of a claim of ineffective assistance of counsel." *Id.*

¶28 Goodall invokes our court's "inherent authority" in making his request that, despite the absence of any rule allowing it, we create a rule permitting remand for a prosecutorial misconduct claim. But our authority does not extend to rule-making. Utah's constitution grants our supreme court the "primary authority over the adoption of rules of procedure and evidence," but even that court is limited by existing rules when reviewing an appeal. *See Cougar Canyon Loan, LLC v. Cypress Fund, LLC*, 2020 UT 28, ¶ 13, 466 P.3d 171 (cleaned up); *see also id.* ("An appeal to this court is not the appropriate means to amend a court rule." (cleaned up)). Indeed, the supreme court stated, "Even where an appellant presents compelling reasons for a policy shift that is not currently supported by the plain language of our rules of procedure, we do not rewrite the rule on the fly. Rather, we refer the issue to the appropriate rules committee for additional study, and, if appropriate, we amend the language of the relevant rule through our normal rule-making process." *Id.* ¶ 15 (cleaned up). Accordingly, we reject Goodall's request that we exercise our "inherent authority" to devise a remedy not provided for in the current rules.

¶29 But Goodall is not without a potential avenue for relief. He may raise this claim in postconviction proceedings, pursuant to the Post-Conviction Remedies Act (the PCRA). *See* Utah Code §§ 78B-9-101 to -503; *id.* § 78B-9-102(1)(a) (establishing the PCRA as "the sole remedy for any person who challenges a conviction or sentence for a criminal offense and who has exhausted all other legal remedies, including a direct appeal"). Goodall contends that being required to raise his claim in postconviction proceedings violates his state constitutional right to appeal because he is not guaranteed counsel at that stage. Our supreme court faced a similar argument in *Gailey v. State*, 2016 UT 35, 379 P.3d 1278, and

acknowledged that although neither "the right to state-paid counsel nor the right to effective assistance of counsel is constitutionally or statutorily guaranteed in postconviction proceedings," that, "the court may, upon the request of an indigent petitioner, appoint counsel on a pro bono basis," *id.* ¶ 28 (cleaned up). Thus, the supreme court held that the claim was unripe because the defendant had not yet sought postconviction relief nor been denied postconviction counsel. *Id.* ¶¶ 28–30. So too here. Although Goodall is not guaranteed counsel under the PCRA, he may be appointed counsel, making his argument that he is being denied the right to counsel unripe at this stage.

¶30 Because the appellate rules do not allow the development of evidence outside the record after filing a notice of appeal unless it is for a claim of ineffective assistance of counsel, we deny for a third time Goodall's request to develop the record for his claim of prosecutorial misconduct. But we note that he may raise his claim in postconviction proceedings should he choose to do so.

## II. Goodall's Statements to Police

¶31 Next, Goodall contends the trial court erred in admitting statements he made that "were the product of involuntary . . . waivers and coercion." The Fifth Amendment prohibits the use of statements obtained by coercion and guarantees that individuals will not be "compelled in any criminal case" to be "a witness against" themselves. U.S. Const. amend. V. The "ultimate test" of whether this protection has been violated and a defendant's statement is involuntary is whether the defendant's "will has been overborne." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (cleaned up). Courts must "assess[] the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation"—in "determining whether a defendant's will was overborne." *Id.* at 226. In other words, courts must consider internal factors such "as the defendant's mental health, mental deficiency, emotional

instability, education, age, and familiarity with the judicial system," as well as "external factors [such] as the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant." *State v. Rettenberger*, 1999 UT 80, ¶¶ 14–15, 984 P.2d 1009.

¶32 First, none of Goodall's personal characteristics weigh in favor of his claim that his statements were involuntary or coerced. Goodall received two *Miranda* warnings in short succession: one by Officer at the beginning of his interview at the Helper Police Station and another by the Chief before his interview at the Carbon County Administration Building. When the Chief asked Goodall how much sleep he had gotten the previous night and if he had eaten that day, Goodall responded that he had slept "[e]ight, nine hours" and had eaten breakfast, but not lunch. Goodall also confirmed he was in overall good health except for having "bipolar" disorder, which caused him "severe anxiety" and "chronic depression." Goodall was familiar with the justice system (having been arrested more than once), responded clearly to questions, and showed no signs that his "will was overborne," *Schneckcloth*, 412 U.S. at 226.

¶33 Second, none of the external factors support Goodall's claim that his statements were involuntary or coerced. His two interviews spanned just over two hours, far shorter than interviews where coercion has been found based on the length of interviews. *See, e.g.*, *Davis v. North Carolina*, 384 U.S. 737, 746–47 (1966) (holding that sixteen days of interrogation was coercive); *Chambers v. Florida*, 309 U.S. 227, 230 (1940) (holding that an "all night vigil" at the end of five days' questioning was coercive). The trial court did not err in determining that the officers used no "improper threats, implied promises, false friend, or coercive police tactics" and were, in fact, "cautious in obtaining two *Miranda* waivers within a short period of time." The recordings of the interviews support the trial court's finding and

show not only that Officer's and the Chief's actions and statements were permissible, but that they also made notable efforts to accommodate Goodall and ensure he understood his rights.

¶34 Finally, the Chief's use of the polygraph test and results as an interview technique was not coercive; it was a permissible form of interrogation. *See Wyrick v. Fields*, 459 U.S. 42, 48 (1982) (per curiam) (rejecting a lower court's determination that the use of polygraph results in police questioning "is inherently coercive"). The record indicates the Chief did not tell Goodall the polygraph test results would be used at trial; instead, the waiver simply stated that the results of the test "will be released to [the Chief], or any others required by law."

¶35 Under the totality of the circumstances, the police employed no coercive tactics and there is no indication on the record that Goodall's two *Miranda* waivers were involuntary. Therefore, the trial court correctly determined that Goodall's incriminating statements and *Miranda* waivers were voluntary.

### III. Jury Instruction

¶36 Next, Goodall contends Counsel rendered ineffective assistance in requesting an instruction that, according to Goodall, labeled his incriminating statements as a "confession." While Goodall concedes it was proper for Counsel to seek "an instruction that would allow the jury to consider the untrustworthy nature of Goodall's statements," he argues the wording of Instruction 34 was problematic because it "allowed jurors to begin their analysis from the premise that Goodall confessed." The State counters that had the jury viewed Instruction 34 as "a judicial pronouncement that Goodall confessed," it would not have reached a mixed verdict. We agree with the State.

¶37 An ineffective assistance of counsel claim requires a defendant to "demonstrate both that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment, and that counsel's deficient performance prejudiced" the defendant. *State v. Powell*, 2020 UT App 63, ¶ 19, 463 P.3d 705 (cleaned up). "Both elements must be present, and if either is lacking, the claim fails and the court need not address the other." *Id*. (cleaned up). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Strickland v. Washington*, 466 U.S. 668, 670 (1984).

¶38 To prevail on the prejudice prong, Goodall "must demonstrate that but for the error, there is a reasonable probability that the verdict would have been more favorable to him." *State v. Apodaca*, 2019 UT 54, ¶ 50, 448 P.3d 1255 (cleaned up). "This requirement is a relatively high hurdle to overcome" because "the likelihood of a different result must be substantial." *Id.* (cleaned up). Goodall has not met this burden.

¶39 The jury was given Instruction 34 so it could assess the trustworthiness of Goodall's incriminating statements. The instruction had no title and used a version of the word "confession" only twice, both times in its opening sentence: "When the Prosecution introduces evidence that the defendant confessed, that confession must be viewed in light of its overall trustworthiness." This sentence reads more as an abstract "if-then" statement than as a judicial pronouncement that Goodall had confessed. The instruction then ends with emphasis on the sufficiency of the evidence to support what it terms as Goodall's "statement," not confession:

> If you find that there is sufficient evidence to believe that the defendant's *statement* is trustworthy, then you may consider it as evidence among the other evidence presented. However, if you find that there

> is not sufficient evidence to establish that the defendant's *statement* is trustworthy, you may disregard the *statement*.

(Emphases added.) Taken as a whole, Instruction 34 did not prejudice Goodall by its inclusion of "confession" at its outset; its focus was on whether the evidence presented matched the statements made by Goodall, thus framing the idea of Goodall's statements as a "confession" as the State's theory to prove.

¶40 When we assess whether Goodall was prejudiced by Counsel's actions, we "must consider the totality of the evidence before the judge or jury." *State v. Garcia*, 2017 UT 53, ¶ 42, 424 P.3d 171 (cleaned up). We are not convinced that without Instruction 34's use of the word "confession," there is a reasonable probability that the result of the trial would have been different. The jury heard Jenny's account of the assault, which was corroborated by Roommate's testimony about the "whimpering" he heard that night and by Goodall's callous text messages to Jenny while she was in the bathroom. The jury also heard Goodall make contradictory statements during his police interviews, such as which sexual act he and Jenny started with, whether he ejaculated in Jenny's mouth, and whether Jenny gagged herself or was caused to gag by Goodall pushing her head down. Finally, the jury heard Goodall remorsefully admit he "might've went a little too far," and that Jenny had "expressed to [him] before she didn't like [anal sex]." On this record, it is unlikely that the jury would have found Goodall not guilty. Thus, Goodall has not established that without this instruction there is a "reasonable probability that the verdict would have been more favorable to him." *Apodaca*, 2019 UT 54, ¶ 50 (cleaned up).

## IV. Rule 608(a) Evidence

¶41 Finally, Goodall contends that Counsel was ineffective in not objecting to the Chief's comments about the credibility of

Goodall's, Jenny's, and Roommate's statements to the police. Goodall also argues the trial court committed plain error when it did not sua sponte strike this testimony. Goodall did not raise this concern at trial and asks us to review this unpreserved issue under the doctrines of ineffective assistance of counsel or plain error. *See generally State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443 (explaining that plain error and ineffective assistance are exceptions to the preservation requirement). Because we conclude that the evidence did not violate rule 608(a) of the Utah Rules of Evidence and that Counsel reasonably could have decided to use these statements to support the theory that the Chief conducted a targeted investigation against Goodall, we conclude that Counsel was not ineffective in not objecting to it. We also conclude it was not plain error for the court to allow it.

¶42    Goodall contends the Chief made three statements on the credibility of witnesses that violate rule 608(a):

**First Statement**

> It goes back to credibility, I guess, of [Goodall] when I was talking to him. He was—there [were] a few inconsistencies that I noticed and that was one of them. His initial statement was that she took her own clothes off. And then at the end, he told me that he told her to take her clothes off.

**Second Statement**

> Counsel:     Were there any inconsistencies in what [Jenny] told [the cousin] versus what she told you in your interview?
>
> The Chief:   [Jenny] was very consistent in that recorded phone conversation by [the cousin].

> Counsel:      [Were] her statements consistent with what the evidence showed?
>
> The Chief:    All I can say is [Jenny] was consistent in the statements she provided me in that recorded phone interview.

**Third Statement**

> The Chief:    [Roommate] seemed articulate. He seemed knowledgeable, I guess.
>
> The State:    Did he seem questionable in what he was saying at all?
>
> The Chief:    Not at all.

Goodall claims that Counsel should have objected to each of these statements or the trial court should have intervened sua sponte to strike the testimony. We disagree.

¶43    Generally, we "give wide latitude to Counsel to make tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Bedell*, 2014 UT 1, ¶ 23, 322 P.3d 697 (cleaned up). Accordingly, our analysis of plain error and ineffective assistance are interwoven because "plain error does not exist when a conceivable strategic purpose exists to support the use of the evidence." *Id.* ¶ 26 (cleaned up).

¶44    First, one of Counsel's theories was that the Chief had "tunnel vision" during his investigation. Counsel effectively demonstrated this theory by his use of the Chief as a witness in Goodall's case-in-chief and by remarks in closing when Counsel urged the jury to make its decision "based upon the evidence, not based upon an officer who has tunnel vision, who wants to go a certain direction and clearly creates his investigation

to reflect that." The Chief's statement about Goodall's credibility came unsolicited during cross-examination when Counsel was seeking to minimize discrepancies in Goodall's interviews. It was sound strategy for Counsel to let that statement go rather than to draw unwanted attention to it with an objection. Similarly, the Chief's statements about Jenny's consistency and Roommate not being questionable corroborated the idea that the Chief had "tunnel vision" in taking their statements at face value and relying too much on their words rather than on actual evidence. Counsel therefore had good reason not to object to these statements.

¶45    Second, Counsel could have reasonably decided that the statements did not violate rule 608(a). Rule 608(a) "prohibits any testimony as to a witness's truthfulness on a particular occasion." *State v. Adams*, 2000 UT 42, ¶ 11, 5 P.3d 642 (cleaned up). Thus, a witness may not "offer a subjective credibility determination that [another witness] was telling the truth," but the rule does not prohibit a witness "from giving testimony from which a jury could infer the veracity of the [other] witness." *Id.* ¶¶ 13–14. Our case law distinguishes between statements made about a witness's truthfulness generally and a witness's statement specifically. *See, e.g., State v. Bair*, 2012 UT App 106, ¶ 47, 275 P.3d 1050 (determining an officer's "observation that [a witness's] trial testimony was consistent with the allegations she made" earlier did not violate rule 608(a)); *State v. Cruz*, 2002 UT App 106U, para. 1, (concluding that testimony "that the victim's story never wavered in its specifics" during her interviews was not an impermissible comment on the victim's credibility). Thus, Counsel's performance was not deficient where there were valid strategic reasons not to object to the Chief's statements. "Accordingly, it was not plain error for the trial court to refrain from interfering with . . . Counsel's strategic decision-making." *State v. Gourdin*, 2024 UT App 74, ¶ 59 n.13, 549 P.3d 685 (cleaned up).

CONCLUSION

¶46    In the absence of a rule expressly granting a defendant the opportunity to develop the record for a prosecutorial misconduct claim during an appeal, we reject Goodall's request to create such a mechanism. The trial court correctly determined that Goodall's incriminating statements and *Miranda* waivers were voluntary. We conclude that Counsel did not render ineffective assistance of counsel by introducing Instruction 34. We also conclude Counsel was not constitutionally ineffective for not objecting to the Chief's testimony, and the trial court did not plainly err when it did not sua sponte strike the testimony. We therefore affirm Goodall's convictions.

―――――――――