**2024 UT App 186**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RICKY EUGENE SANDOVAL,
Appellant.

Opinion
No. 20220620-CA
Filed December 19, 2024

Seventh District Court, Price Department
The Honorable Jeremiah Humes
No. 211700469

Freyja Johnson, Rachel Phillips Ainscough, and Anna
Grigsby, Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

OLIVER, Judge:

¶1 A jury convicted Ricky Eugene Sandoval on one count of forcible sexual abuse. Sandoval appeals that conviction on the ground of ineffective assistance of counsel. Specifically, Sandoval contends that his trial counsel (Counsel) rendered constitutionally ineffective assistance (1) by stipulating to the admission of text messages between Sandoval and the victim's mother that he claims were not properly authenticated and (2) by failing to object to witness statements that he claims were unfairly prejudicial. We reject these arguments and affirm his conviction.

BACKGROUND[1]

¶2 Robyn[2] and her mother (Mother) lived together in a house they rented from a landlord (Landlord). Another woman (Friend) lived with them, sleeping on the living room couch. Sandoval was a friend of both Mother and Landlord and had put them in touch when Mother and Robyn were looking for a place to live.

¶3 Landlord tried to evict Robyn and Mother for their failure to pay rent. When they refused to leave, Landlord took "inappropriate" steps to remove them that resulted in Robyn and Mother obtaining a civil protective order against him. Robyn and Mother continued to live in the house without paying rent. On December 30, 2020, and again on February 10, 2021, Landlord served Robyn and Mother with a three-day notice to vacate for criminal nuisance. Amid these tensions between Landlord and his tenants, Sandoval visited the residence a few times, "hanging out" or picking up Landlord's personal property for him.

¶4 On the evening of February 11, 2021, Sandoval had been in and out of the house so many times to get Landlord's belongings that Friend eventually left the door unlocked so she could sleep uninterrupted on the couch. Around 2:00 a.m., Robyn awoke in her bedroom to find her tank top and bra pushed up and Sandoval fondling her exposed breasts. Although she was "half asleep and waking up," Robyn yelled at him multiple times to "stop." Sandoval stopped touching her when Friend walked in. Friend had heard Robyn repeatedly telling someone to "stop," and when Friend opened the door to Robyn's room, she saw Sandoval trying

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

2. A pseudonym.

to hide behind the door. Friend returned to the couch, and Sandoval followed and sat next to her. Friend asked Sandoval what he was doing in Robyn's room, and his response was to "just tell [her] that she was dreaming." Mother was asleep in her bedroom next to Robyn's when she heard Robyn "hollering." By the time she got dressed to see what was going on, she saw Sandoval in the family room talking with Friend. Mother went and talked to Robyn, who told her about the assault, and then Mother went back to the family room and confronted Sandoval.

¶5 A few days later, Robyn reported the sexual assault, and an officer (Officer) came to the house in response. When Officer took Mother's statement, Mother told him that a week or two before Robyn's assault, Sandoval had similarly assaulted her in the night. Mother "woke up to him fondling [her] breasts" over her clothes. She asked what he was doing, and he said "nothing" and that she "must have been dreaming." Officer took written statements from Robyn, Mother, and Friend, passing them along to the detective (Detective 1) assigned to the case.

¶6 On March 10, Detective 1 met with Robyn and Mother. He suggested they try "pretext messaging," which he explained is a common investigatory technique used by law enforcement, to communicate with Sandoval about Robyn's assault. Robyn did not have a phone, nor did she feel comfortable interacting with Sandoval, so Mother used her phone and pretended to be Robyn. During the meeting with Detective 1, she texted, "Hey, is this Rick?" and waited for him to reply. When over an hour passed and Sandoval had not responded, Detective 1 ended the meeting, instructing Mother that if Sandoval replied, she "[couldn't] lead him" but she should "just see what he'll say."

¶7 On March 15, Mother called Detective 1, saying that Sandoval had replied and she had been texting with him over the last few days about the incident. She wanted to show Detective 1 the texts, so he met with her to review the texts. As Detective 1

testified, he did not instruct Mother "exactly what to say" and thought she "went rogue a little bit with this pretext thing."

¶8     The text exchange centered on small talk for the first couple of days, with Sandoval asking if Robyn and Mother still lived at Landlord's house and updating them on where he was currently living. Then Mother—posing as Robyn the entire time—and Sandoval texted as follows:

> [Mother]: By the way, sorry I hollered when you came in my room the other day, you woke me from a sound sleep and I didn't know what you were doing . . . I've never been woken up like that before is that why you stopped because I hollered if it was [I'm] sorry you shouldn't have stopped!!
>
> [Sandoval replying the following night]: You at home tonight?
>
> [Mother]: Nope not tonight, sorry[.]
>
> . . . .
>
> [Mother]: You know what you did when you tried to wake me up or you didn't try to wake me up. . .
>
> [Sandoval]: You woke as I had just got there, ask [F]riend on the couch.
>
> [Mother]: She told me she found you in my room and the door was locked so you had to have jimmied it to come in she said she heard me say stop and when she walked in . . . you were standing there and she asked you what you [had] done you told her if I ask to tell her I was dreaming . . . but we both know I wasn't dreaming

[Sandoval]: Didn't happen, door was shut but not locked, promise!

. . . .

[Mother]: I've never been awakened that way before. But you didn't need to stop once I woke up and got my bearings and realized what was going on.

[Sandoval]: Really??? Not even true

. . . .

[Mother]: You were in my room after all[.]

[Sandoval]: Yes and you were sleeping!

[Mother]: Yeah I know I was until you woke me up very interesting wake up call I have to admit

[Sandoval]: I guess, you didn't say nothing!

. . . .

[Mother]: Enough of the games. You know you touched me in an inappropriate manner

[Sandoval]: There's no way and this is not a game, thank you very much!

¶9    Detective 1 photographed the texts and Sandoval's contact page on Mother's phone. He then verified Sandoval's phone number with a "[c]ounty document" in which "Sandoval had put that [same] number down as his personal contact number." Detective 1 also confirmed the "messages were sent between March 10th and March 15th" and explained he had "correlate[d]

the days of the week" on the photographed texts with the dates to make that determination.

¶10 The State charged Sandoval with one count of forcible sexual abuse based on the allegation made by Robyn. His case proceeded to a jury trial. Before testimony was presented, the parties and the court engaged in a colloquy about the admission of exhibits. Counsel stipulated to the admission of numerous State exhibits, including the photographs of the text exchange on Mother's phone.

¶11 In addition to testimony about the incidents and investigation as described above, the State elicited testimony from Friend that, later on the same night of Robyn's assault, Friend woke up to find Sandoval standing by the couch with his exposed penis "right in [her] face." She told Sandoval, "I'm not into that." On cross-examination, Counsel asked Friend about her failure to tell the police about Sandoval exposing himself to her. Friend admitted she had not told Officer about Sandoval exposing himself but said she had included it in the written statement she completed. Friend also testified she was not certain whether Sandoval exposed his penis to her before or after Robyn's assault, but it was sometime that night.

¶12 When Mother testified, she went into detail about the uncharged incident in which Sandoval allegedly touched her breasts. She acknowledged some of the details of her alleged assault were "fuzzy," such as whether she rolled over and then said something to Sandoval after he touched her breasts or what she even said to him. But when asked why she recalled "him touching [her] breast . . . so vividly," she said that it was because she was "not used to a man fondling" her. And when asked how it made her feel, she responded, "Violated." The State then asked Mother about her experience texting Sandoval and "[w]hat was going through [her] mind as [she was] sending those text

messages." She replied, "He's dodging my questions. He's not answering them truthfully."

¶13    Finally, the State called as a witness a detective (Detective 2) who assisted Detective 1 in the investigation. He described how Robyn was "very concerned" about Sandoval returning to the house and "didn't feel protected" "with him being at large," so Detective 2 and Robyn created "a safety plan," which, as he explained, is "a very common thing to do" "when there's an allegation." The plan included Robyn and Mother being "aware of [their] surroundings" and calling 911 if Sandoval "arrive[d] unwanted," and officers being notified "that there could be a concern" regarding Sandoval and to "take it seriously." The State asked whether the safety plan was ever triggered by Sandoval returning to the house, and Detective 2 said that while the detectives received calls of general worry about why Sandoval was "not being dealt with," Robyn and Mother did not report anything "specific about him going to the residence," and no "official action" had to be taken in response to those phone calls.

¶14    Sandoval presented no witnesses. In closing, the State said the text messages were important "because [in them, Sandoval] admits to being in her bedroom while she is sleeping." During Counsel's closing, he focused on discrepancies in and between Robyn's, Mother's, and Friend's testimonies. Counsel also emphasized Landlord's efforts to evict Robyn and Mother, arguing that "context matters" because Robyn and Mother "were this close to being on the streets and they lashed out at anybody who was perceived to be in cahoots with [Landlord]."

¶15    The jury was instructed that any evidence they had heard about Sandoval making "sexual acts or advances toward other individuals who have testified . . . was not admitted to prove a character trait . . . or to show that he acted in a manner consistent with that trait." The instruction went on to explain that the jury could, however, "consider this evidence, if at all, for the limited

purpose of opportunity, plan, or intent to commit the crime alleged to have [been] committed against [Robyn]."

¶16    After deliberation, the jury returned a verdict finding Sandoval guilty of one count of forcible sexual abuse. The trial court later sentenced Sandoval to a suspended prison term of one to fifteen years and imposed forty-eight months of probation and 105 days of jail time.

## ISSUE AND STANDARD OF REVIEW

¶17    Sandoval contends that Counsel rendered constitutionally ineffective assistance. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Whytock*, 2020 UT App 107, ¶ 14, 469 P.3d 1150 (cleaned up).

## ANALYSIS

¶18    Sandoval asserts Counsel rendered constitutionally ineffective assistance in two ways. First, Sandoval contends Counsel should not have stipulated to the admission of the text messages between Sandoval and Mother because they "were not properly authenticated and lacked appropriate foundation." Second, Sandoval contends Counsel rendered ineffective assistance by failing to object to three separate statements by prosecution witnesses that he claims were unfairly prejudicial.

¶19    To establish ineffective assistance of counsel, a defendant must meet the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. To prove deficient performance, Sandoval must demonstrate Counsel's

"representation fell below an objective standard of reasonableness." *Id.* at 688. The deficient performance inquiry "should focus on whether counsel's assistance was reasonable considering all the circumstances," and it "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Gallegos*, 2020 UT 19, ¶ 34, 463 P.3d 641 (cleaned up). "Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

¶20    Because "[a] defendant must satisfy both parts of this test in order to successfully establish ineffective assistance," *State v. Whytock*, 2020 UT App 107, ¶ 26, 469 P.3d 1150, "if we determine that a defendant has made an insufficient showing on one component, we need not address the other," *State v. Cabututan*, 2022 UT App 41, ¶ 20, 508 P.3d 1003 (cleaned up). Here, both of Sandoval's ineffective assistance claims fail under the first prong.

## I. The Text Messages

¶21    Sandoval contends Counsel's stipulation to the admission of the text messages constitutes ineffective assistance because the text messages were unauthenticated. We disagree. Specifically, Sandoval cannot show it was deficient performance for Counsel to stipulate to the admission of the text messages; the texts would have been admissible even if Counsel had not stipulated to admit them.

¶22    "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Utah R. Evid. 901(a). Thus, a party seeking to introduce "writings or other documentary evidence must authenticate the evidence before it can be admitted." *State v. Welsh*, 2022 UT App 112, ¶ 36, 519 P.3d 572 (cleaned up), *cert. denied* 525 P.3d 1278 (Utah 2023). However, "proper

authentication does not require conclusive proof"; instead, "the proponent has to make only a prima facie showing of authenticity." *Id.* (cleaned up).

¶23   Although Utah's courts have had relatively few opportunities "to consider the foundational requirements that must be met in order for text messages to be admitted," *State v. Otkovic*, 2014 UT App 58, ¶ 22, 322 P.3d 746, when they have, they have joined "a number of other jurisdictions" that allow text messages to be authenticated by circumstantial evidence, *id.* For example, in *State v. Otkovic*, we held that "the State met its burden to make a prima facie showing of authenticity" by "presenting evidence that the phone from which the text messages originated belonged to [the defendant] and that he had possession of it at the time the messages were sent." *Id.* ¶ 23. Specifically, the evidence showed that the texts in question "were sent from the phone number assigned" to a phone found in the defendant's apartment, that the phone matched a witness's description of the phone he saw the defendant use during the crime, and that "the [crime] occurred during the same time frame when the text messages were sent." *Id.*

¶24   Similarly, in *State v. Welsh*, we held that the State's "several pieces of evidence," such as the "timing and content" of the messages, "when combined, were sufficient to support a finding that [the defendant] authored the texts." 2022 UT App 112, ¶¶ 41, 44. The timing of the messages, for instance, supported a finding that the defendant had sent them because they were sent just a few hours after the defendant "broke into [the victim's] apartment and tried to tie her up" and the content of the messages included "information that was particular to" their relationship and "to things that had happened that evening involving" the defendant. *Id.* ¶¶ 44–45. Thus, we concluded that "[t]hese corroborative circumstances supported a finding that [the defendant] had sent the texts." *Id.* ¶ 45.

¶25    Here, the timing of the messages is less clear than in *Welsh*, particularly since the photographed texts do not include any dates. But they do include days of the week and times that, together with Detective 1's testimony that he "correlate[d] the days of the week with the dates" and determined the "messages were sent between March 10th and March 15th," make it possible to piece together the timing. The messages also contain details about the parties' relationship—where and with whom they live, for example—and about the events of the night in question that only Sandoval, Robyn, Mother, and Friend would have known. Moreover, Detective 1 testified he photographed the texts and Sandoval's contact page on Mother's phone. *See* Utah R. Evid. 901(b)(1) (listing "[t]estimony that an item is what it is claimed to be" as an example "of evidence that satisfies the requirement" of authentication). And Detective 1 testified that he verified that the texts to Mother came from Sandoval's phone number by locating a "[c]ounty document" on which Sandoval had put the same "number down as his personal contact number." In light of "these corroborative circumstances" that "supported a finding that [Sandoval] had sent the texts," *see Welsh*, 2022 UT App 112, ¶ 45, reasonable counsel could have chosen not to challenge their authenticity, *see State v. Kufrin*, 2024 UT App 86, ¶ 57, 551 P.3d 416 (concluding it was not deficient performance for trial counsel to not make an objection that "would have been a futile exercise"). Therefore, Sandoval has not "overcome the presumption" that Counsel's decision to stipulate to their admission "might be considered sound trial strategy." *State v. Lee*, 2014 UT App 4, ¶ 13, 318 P.3d 1164 (cleaned up).

¶26    In sum, the text messages would have been admitted into evidence even if Counsel had not stipulated to their admission and instead raised an objection to their lack of authentication.[3]

---

3. Repeatedly, Sandoval's briefing faults not just Counsel for stipulating to the admission of the texts but also the State for "not

(continued…)

Accordingly, we conclude Counsel did not perform deficiently and that this claim of ineffective assistance therefore fails.

## II. The Rule 403 Statements

¶27 Sandoval also asserts Counsel rendered ineffective assistance by failing to object under rule 403 of the Utah Rules of Evidence to the following three statements:

1. Mother's statement that she felt "Violated" when Sandoval touched her breasts.

2. Mother's statement that while texting Sandoval, she thought: "He's dodging my questions. He's not answering them truthfully."

3. Detective 2's statement that he developed "a safety plan" with Robyn and Mother to help them feel safe from Sandoval.

We hold that because none of these statements' probative value is substantially outweighed by the danger of unfair prejudice, *see*

---

lay[ing] an adequate foundation authenticating that [Sandoval] had authored the text messages." The State, however, argues Sandoval cannot challenge the lack of foundational evidence "when any lack of formal evidence is the direct result of his own stipulation." We agree with the State. Generally, "courts are bound by stipulations between parties" and "parties are bound by their stipulations." *Yeargin, Inc. v. Auditing Div. of Utah State Tax Comm'n*, 2001 UT 11, ¶ 19, 20 P.3d 287 (cleaned up). Here, the State "was relieved of the burden" of establishing the text messages' authenticity "because the parties stipulated" to their admission. *State v. Chadwick*, 2023 UT 12, ¶ 32, 557 P.3d 563. Thus, Sandoval cannot now challenge the lack of formal foundational evidence when his stipulation caused it in the first place.

Utah R. Evid. 403, Counsel did not perform deficiently by failing to make rule 403 objections to any of these statements.

¶28    "Relevance is a very low bar for the admission of evidence." *State v. Swearingen*, 2023 UT App 155, ¶ 11, 542 P.3d 123 (cleaned up). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Utah R. Evid. 401. But relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice" or "misleading the jury." *Id.* R. 403. Under rule 403's balancing test, "evidence is only unfairly prejudicial if it creates an undue tendency to suggest decision on an improper basis." *Swearingen*, 2023 UT App 155, ¶ 20 (cleaned up).

¶29    **Statement 1.** Sandoval claims Mother's statement about feeling "Violated" had little probative value and essentially asked the jury to decide Sandoval's guilt on a "forbidden propensity inference." *See* Utah R. Evid. 404(b)(1) (prohibiting other-acts evidence from being admitted "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character"). We disagree.

¶30    In the written jury instructions, the jury was instructed that any evidence they had heard about Sandoval making "sexual acts or advances toward other individuals who have testified . . . was not admitted to prove a character trait . . . or to show that he acted in a manner consistent with that trait." They could, however, "consider this evidence, if at all, for the limited purpose of opportunity, plan, or intent to commit the crime alleged to have [been] committed against [Robyn]." And so the State was allowed to present Mother's testimony about Sandoval fondling her breasts as she slept in her bed for the narrow purpose of showing Sandoval had the opportunity, plan, and intent to do the same to Robyn. Furthermore, the statement was made in the context of clarifying Mother's memory of the incident. After Mother testified

that some of the details of what she said or did after the assault were "fuzzy" to her, the State asked her why she recalled "him touching [her] breast . . . so vividly" and how she felt when it happened. Mother stated that she "was not used to a man fondling" her and it made her feel "Violated," thus explaining why she recalled Sandoval touching her breasts but not other details of the incident.

¶31    Against this backdrop, Counsel did not perform deficiently by not raising a rule 403 objection to Mother's statement she felt "Violated." Counsel knew the jury would be instructed on how to consider the other-acts evidence about Sandoval, and Mother's comment explaining her memory was "brief" and "quickly passed over by the State." *See State v. Hulse*, 2019 UT App 105, ¶ 40, 444 P.3d 1158. Thus, it "is conceivable that a competent attorney would have chosen not to draw the jury's further attention to the fleeting exchange by objecting to its content." *Id.*

¶32    **Statement 2**. Sandoval contends Mother's speculation that he was "dodging [her] questions" and "not answering them truthfully" violated rule 403 because it went beyond Mother's personal knowledge and had little probative value.[4] We disagree.

¶33    Mother's statement was made when the State asked Mother what she was thinking as she and Sandoval texted each other. Hence, Mother was testifying about what was going through *her* mind, not Sandoval's, so her testimony about her state of mind when she was texting lands squarely in the realm of personal knowledge rather than speculation that could mislead the jury. Moreover, Mother was there the night of the assault and

---

4. Sandoval also argues this statement violates rule 608 of the Utah Rules of Evidence, which prohibits "any testimony as to a witness's truthfulness on a particular occasion." *State v. Lewis*, 2020 UT App 132, ¶ 21, 475 P.3d 956 (cleaned up). However, Sandoval did not testify at trial, making rule 608 inapplicable.

knew about its details from Robyn and Friend. Thus, a rule 403 objection by Counsel would have likely been unsuccessful, making it "sound strategy for Counsel to let that statement go rather than to draw unwanted attention to it with an objection." *State v. Goodall*, 2024 UT App 100, ¶ 44, 554 P.3d 1155.

¶34 **Statement 3**. Sandoval argues Detective 2's statement that he developed "a safety plan" with Robyn and Mother to help them feel safe from Sandoval violated rule 403 by encouraging "the jury to convict on the emotional basis of sympathy for the women." We are unconvinced that this brief statement by Detective 2 created "an undue tendency to suggest decision on an improper basis," *Swearingen*, 2023 UT App 155, ¶ 20 (cleaned up), particularly when it was immediately followed by Detective 2's explanation that safety plans are commonly created after assault allegations are made. Consequently, Counsel did not have grounds to successfully object to the statement and did not render deficient performance by not doing so. Furthermore, Counsel may have had a strategic reason to allow the statement, such as the fact that Sandoval never returned to the house. As it happened, the State drew attention to this favorable fact for Sandoval in its direct examination of Detective 2 when it asked whether Sandoval had returned to the house and Detective 2 responded that, to the best of his knowledge, he had not. Accordingly, reasonable counsel could have chosen to allow Detective 2's mention of a safety plan to go unopposed, and we cannot say it was deficient performance for Counsel to do the same.

¶35 To summarize, each of these three statements was admissible under rule 403, making it unlikely that any objection by Counsel would have succeeded. Additionally, strategic reasons existed as to why Counsel did not object to them. Therefore, Sandoval's claim of ineffective assistance on each statement fails.

CONCLUSION

¶36    Counsel's conduct in stipulating to the admission of the text messages and in not objecting to certain witnesses' statements under rule 403 did not amount to deficient performance. Thus, Sandoval's claims of ineffective assistance fail, and we accordingly affirm his conviction.

———————